[No. 29906-6-III.   Division Three.   March 8, 2012.]

JOHN HYMAS, *Appellant*, v. UAP DISTRIBUTION, INC., ET AL., *Respondents*.

*Stanley J. Rumbaugh* and *John E. Wallace* (of *Rumbaugh Rideout Adkins & Wallace PLLC*), for appellant.

*Benjamin A Schwartzman* (of *Banducci Woodard Schwartzman PLLC*) (*Brent S. Bastian*, of counsel), for respondents.

140

¶1 SIDDOWAY, J. — We are called upon to decide whether UAP Distribution Inc., the owner of a jobsite at which John Hymas was seriously injured while working construction, was entitled to summary judgment that it had no statutory or common law duty that could give rise to liability for Mr. Hymas's fall into an unguarded trench. Mr. Hymas, whose employer was UAP's cement contractor, argues that UAP owed him a duty of care under WISHA,[1] as a jobsite owner, because it retained control over his employer's work. He argues that UAP owed him a duty under common law, as a landowner, because it should have anticipated that Mr. Hymas could be injured despite his knowledge of the open trench. We find no issues requiring trial and agree with the trial court that on the evidence presented UAP owed no duty as a matter of law. We affirm the dismissal of Mr. Hymas's claims.

## FACTS AND PROCEDURAL BACKGROUND

¶2 UAP Distribution Inc.[2] is a chemical and fertilizer manufacturer that does a nationwide business. In 2006, it contracted with Ranco Fertiservice Inc., a manufacturer of fertilizer-handling equipment, to develop plans for constructing a fertilizer mixing plant on land that UAP owned

---

[1] Washington Industrial Safety and Health Act of 1973 (WISHA), ch. 49.17 RCW.

[2] In January 2009, UAP merged with and is now doing business as Crop Production Services Inc., which is owned by parent company Agrium US Inc. Defendant Agreserves Inc. was dismissed voluntarily by the parties in April 2010. We refer to the three remaining affiliated defendants, collectively, as UAP.

in Plymouth, Washington. UAP did not hire a general contractor to manage the construction work. Instead, armed with Ranco's plans, it contracted directly with an engineering firm and specialty contractors. UAP had opted to forgo the services of a general contractor on earlier construction projects.

¶3 Ranco's plans called for the excavation of a 5-foot-deep, 240-foot-long, 10-foot-wide trench framed with concrete within one of three buildings proposed for the plant, in which a below-grade conveyor belt would eventually be installed. UAP hired Narum Concrete Construction Inc. to perform the excavation and concrete work.

¶4 UAP and Narum entered into a written contract prepared using an American Institute of Architects (AIA) standard form agreement.[3] Subsection 8.2.1 of the contract (under article 8, "CONTRACTOR," and section 8.2, "SUPERVISION AND CONSTRUCTION PROCEDURES") provides:

> The Contractor [Narum] shall cooperate fully with the Owner [UAP] and Architect and supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters.

Clerk's Papers (CP) at 96 (redlining[4] omitted). Sections 15.1 and 15.3 of the contract, under article 15, "PROTECTION OF PERSONS AND PROPERTY," provide in part:

> 15.1 SAFETY PRECAUTIONS AND PROGRAMS
>
> The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connec-

---

[3] AIA Document A107—1997, the "Abbreviated Standard Form of Agreement Between Owner and Contractor for Construction Projects of Limited Scope where the basis of payment is a STIPULATED SUM." Clerk's Papers at 91-111.

[4] "Redlining" is the formatting that tracks the parties' completion or modification of the form document. It appears in the signed contract in this case.

tion with the performance of the Contract. The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to:

.1    employees on the Work and other persons who may be affected thereby;

.2    the Work and materials and equipment to be incorporated therein; and

.3    other property at the site or adjacent thereto.

The Contractor shall give notices and comply with applicable laws, ordinances, rules, regulations and lawful orders of public authorities bearing on safety of persons and property and their protection from damage, injury or loss. . . .

. . . .

15.3 The Contractor shall comply with all applicable safety laws and regulations. Notwithstanding any language to the contrary, the Owner and the Architect shall not have any responsibility for job site inspections or safety accommodations. Any inspections or observations by the Owner or the Architect are solely for the benefit of the Owner and shall not create any duties or obligations to anyone else.

CP at 104 (redlining omitted). The contract gave UAP the right to terminate the contract for any reason, approve subtier contractors, perform the construction work with its own forces, inspect the work, stop or delay the work, order changes to the work, and reject the work.

¶5 On February 9, 2007, Narum employees were at the jobsite performing concrete work. Mr. Hymas, a concrete pump operator, was operating the pumper truck remotely. His work required that he follow along as a co-worker, who was holding a discharge hose supported by a crane, poured concrete into forms at an elevation 15 feet above them. While watching the pour, Mr. Hymas regulated the pressure and flow of the concrete using a wireless remote box that he wore as a backpack, the controls resting on his chest. At the time of the accident resulting in this action, Mr. Hymas was following his co-worker alongside the trench, which had by

then been framed with concrete. While operating the pump, Mr. Hymas stepped over the edge, which was unguarded by safety rails, and fell into the trench. He seriously injured his leg.

¶6 Mr. Hymas brought this action against UAP, asserting that UAP failed to maintain the trench in compliance with WISHA regulations and negligently failed to protect or warn him of a hazardous condition. His complaint implicated issues of whether and to what extent UAP had retained or exercised control over Narum's work. The parties engaged in deposition and other discovery into their representatives' understandings of the contract and UAP's actual working relationship with Narum and other specialty contractors.

¶7 Evidence as to the parties' background, beliefs, and actions was essentially undisputed. It established that before building the Plymouth plant, UAP had entered into contracts with specialty contractors on 24 occasions. In connection with construction of the Plymouth plant it contracted not only with Ranco, but with an engineering firm, an electrical contractor, a construction company engaged to pipe water to the site, a shed manufacturer engaged to erect a control room, and a material testing and inspection firm to perform site inspections and quality control. UAP exercised its contractual right to perform a portion of Ranco's work, painting pieces of the steel frame for the building that had been scratched in transit and having two idle employees from its Moses Lake facility assist Ranco employees with other painting and welding. In the second phase of the plant, it terminated a pipefitting contractor whose pace was slowing the project and took over the work with its own employees. UAP paid the specialty contractors directly, for a total project cost of over $4 million.

¶8 UAP area manager Brian Jones visited the work site frequently at first and "every couple weeks" as the project progressed. CP at 251. While Narum was on-site, Mr. Jones

would meet with Wayne Narum, a Narum principal, "just to find out where we're at on our status and on our process just to see how work was going." *Id.* He never met with a Narum representative other than Mr. Narum, did not discuss safety issues, and did not instruct Narum employees on how to perform the work. UAP plant manager Harold Priest testified that different specialty contractors worked on the jobsite at the same time and that UAP coordinated their work, although it did not coordinate site safety.

¶9  UAP managers Mr. Priest and Larry Talmage testified that their contact with Narum never involved discussions about the performance of the work and was generally limited to observing progress on the project. Mr. Priest testified that Narum had sole control over the methods employed to do the work, that UAP could not instruct Narum to perform in a particular manner, and that UAP relied on Narum to ensure a safe working environment. Mr. Talmage stated that he understood UAP's contracts made each contractor responsible for observing safety requirements.

¶10  Mr. Narum testified to a similar view of his relationship with UAP, stating that his conversations with Mr. Jones were limited to "how the project was progressing, when we thought we'd have this completed or that." CP at 307. He testified that they did not generally discuss safety issues, other than one occasion when he and a UAP representative discussed a safety concern regarding what he described as a deep "leg pit." CP at 58. Mr. Narum viewed safety as his company's responsibility and did not expect UAP to involve itself in safety matters. He also stated that Narum had control over the way the work was to be performed under subsection 8.2.1 of the contract, and that UAP did not and could not instruct Narum on the methods it was to employ during the course of performance. He did acknowledge that UAP instructed him on the order in which Narum was to construct the three buildings called for by Ranco.

¶11 In proceedings below and on appeal, Mr. Hymas attached importance to certain testimony of Mr. Jones and Mr. Narum. Because UAP argues from the same testimony, although placing a different construction and emphasis upon it, we reproduce what Mr. Hymas and UAP urge as material portions of the testimony verbatim.

¶12 Mr. Jones, who, again, was UAP's area manager, testified in deposition:

Q —[H]ad you observed—had you—like if you observed an unsafe condition on the construction project, would you have brought it to Narum Concrete Construction's attention?

A I probably would, but unless it's something really obvious, I mean, I can't—but, yeah, I mean, obviously if I was to see somebody going to hurt themselves, yeah, I would definitely say something.

Q And if you told someone at Narum to correct an unsafe condition that you saw, do you believe that they would have followed your instruction?

. . . .

[A] I don't know. I really don't know if they would or wouldn't. You know, I don't know.

. . . .

Q No, I understand you don't know if, in fact, they would.

Would you expect them to?

. . . .

A Okay. I—I guess if I was to see if somebody was going to get hurt, I would hope that they would do that. Yeah, I'd hope that they would correct their—their—their issue of if somebody was going to get hurt, yeah. I mean, I think that's, you know, the right thing to do, but—

Q Right. And they're working for you. So if they—if you told them to do something and they told you no, that would probably be a problem for you I would imagine?

. . . .

[A] Well, let me back up. If I saw somebody that was going to be hurt or like get run over by a truck, yeah, I would tell them that, yeah, move the hell out of the way.

. . . .

Q Okay.

A But as far as if they're going to take my advice or not, I mean, it's not my responsibility, so they—you know—you know, I don't know what their practices are or aren't, so whatever they do, they do. I mean, if it's an employee working for me, it's a totally different situation.

Q I understand.

UAP would want to make sure that they're hiring safe contractors though; is that correct?

. . . .

[A] Yeah, we'd obviously want to have safe contractors, yes.

CP at 87-88.

¶13 Mr. Narum testified in deposition:

Q Did UAP ever raise safety concerns to you or anyone at Narum Concrete Construction?

A Now, that one I can't recall. I—they could have. I do not know for sure. I don't really remember.

Q You don't recall if they ever raised a safety issue?

A No.

Q Okay. If UAP raised a safety issue and told you to change something that you were doing because UAP thought it was unsafe, would you have followed UAP's instructions?

A Yes.

CP at 42. And,

Q Did you UAP—did UAP do anything to ensure Narum was performing its work in a safe manner?

A They were onsite while we were doing the work process, so I'm—if something was unsafe, I would have thought something would have been said.

CP at 44-45. And,

Q So amongst the people you identified, you would have been the person at Narum to whom observations about safety issues should be directed?

A That's correct.

Q And do you have any specific recollection of UAP ever coming to you and talking about safety issues?

A Just when we were doing the lighting. And I don't remember the conversation, but I do know they were talking safety on—while they were doing the light leg corning out.

Q The what?

A The leg. The leg where that conveyer pit comes in, that real tall, 20-foot deep leg pit that comes out. I know we—we talked some safety there, but I—it was just basically making sure that it was covered, or I mean, the [perimeter] was a safe place, because it was 20 feet deep.

CP at 58. And,

Q And so UAP had some discussions with you regarding safety when you were performing work on that leg; is that correct?

A Yes.

Q Do you recall exactly what the safety issue was that was being discussed?

. . . .

[A] Just a very large, deep hole.

. . . .

Q They wanted to make sure nobody fell into it or—

A Correct. Or vehicles.

Q And what did you do to satisfy UAP's concerns?

A We barricaded it up.

CP at 61-62.

¶14 Following discovery, Mr. Hymas and UAP moved for summary judgment. Their cross motions brought to light a dispute over whether Mr. Hymas had adequately pleaded a premises liability claim in addition to a statutory claim. The trial court granted UAP's motion to dismiss Mr. Hymas's statutory claim but found adequate notice in Mr. Hymas's complaint of a premises liability claim and, by its order, amended his complaint to conform it to his evidence.

¶15 Shortly thereafter, UAP moved for summary judgment on the premises liability claim. The court granted UAP's motion. Mr. Hymas timely appealed the dismissal of his two claims.

## ANALYSIS

### I

¶16 We first address Mr. Hymas's assignment of error to the trial court's dismissal of his WISHA claim. UAP argues that invited error—Mr. Hymas's own argument below that material facts bearing on the statutory claim were undisputed and the court could rule on the liability issue as a matter of law—precludes review of Mr. Hymas's argument. It also argues, as it did below, that it owed Mr. Hymas no duty as a matter of law.

### *Invited Error*

¶17 The invited error doctrine prohibits a party from setting up an error at trial and then complaining of it on appeal. *Kenneth W. Brooks Trust A. v. Pac. Media, LLC*, 111 Wn. App. 393, 400, 44 P.3d 938 (2002). It applies when a party "takes affirmative and voluntary action that induces the trial court to take an action that party later challenges on appeal." *Lavigne v. Chase, Haskell, Hayes & Kalamon, PS*, 112 Wn. App. 677, 681, 50 P.3d 306 (2002).

¶18 UAP relies for its assertion of invited error on Mr. Hymas's position asserted at the time of the summary judgment hearing, which it characterizes as the "exact opposite position" from his present argument that the evidence presents, at minimum, a jury question. Br. of Resp't at 16. It points to the following argument by Mr. Hymas's lawyer:

[UAP is] responsible to Mr. Hymas for the consequences of this failure as a matter of law. The interpretation of contract terms is a legal question and because these facts aren't in

material dispute, it's only the legal effect of the facts. Mr. Hymas is entitled to summary judgment that UAP had control over the work site based on the contract that they had with Narum and the control that they reserved contractually—and exercised.

Report of Proceedings (Dec. 17, 2010) at 19.

¶19 UAP's argument fails to consider the nature of the dispute that the trial court resolved by summary judgment. The point of contention was over which historical facts matter, and whether the historical facts that *do* matter, together with the ultimate facts they support, are sufficient to preclude judgment as a matter of law. The parties did not dispute the historical facts: e.g., how many times Mr. Jones was at the jobsite, what he discussed with Mr. Narum, or the content of the parties' contract. But they clearly disputed an ultimate fact: whether UAP retained sufficient control over Narum's work to give rise to liability.

¶20 Mr. Hymas's position below was that the evidence that *he* relied on (e.g., the contract provisions he cited, Mr. Jones's testimony that he would raise a safety concern, Mr. Narum's testimony that Narum would address any concern raised, and the action taken on the occasion when a safety concern was expressed) was the evidence that mattered, and that it supported judgment in his favor as a matter of law. He never argued that—whatever the court's view of his argument—it should resolve the case by granting summary judgment one way or the other. To the contrary, his brief opposing UAP's motion for summary judgment argued that "[a]t the very least, there is a question of fact regarding whether UAP retained a sufficient amount of control to justify imposing a duty to ensure WISHA compliance." CP at 354. Nothing in his position induced the court to decide summary judgment against him, and invited error does not bar his appeal.

*Summary Judgment*

¶21 A claim of negligence requires the plaintiff to establish (1) the existence of a duty owed, (2) breach of that duty, (3) resulting injury, and (4) proximate cause between the breach and the injury. *Tincani v. Inland Empire Zoological Soc'y*, 124 Wn.2d 121, 127-28, 875 P.2d 621 (1994). UAP initially moved for summary judgment on the basis that Mr. Hymas could not establish the essential element of a duty owed him by UAP under WISHA.

¶22 The threshold determination of whether the defendant owes a duty to the plaintiff is a question of law. *Id.* at 128. The existence of a duty may be predicated upon statutory provisions or on common law principles. *Degel v. Majestic Mobile Manor, Inc.*, 129 Wn.2d 43, 49, 914 P.2d 728 (1996). Since duty is ordinarily an issue of law, it is only where duty depends on proof of facts that are disputed that summary judgment is inappropriate. *See Afoa v. Port of Seattle*, 160 Wn. App. 234, 238, 247 P.3d 482 (citing *Sjogren v. Props. of the Pac. Nw., LLC*, 118 Wn. App. 144, 148, 75 P.3d 592 (2003)), *review granted*, 171 Wn.2d 1031 (2011).

¶23 We review an order granting summary judgment de novo. *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). Summary judgment is proper if no genuine issue of material fact remains and the moving party is entitled to a judgment as a matter of law. CR 56(c). A defendant may move for summary judgment on the ground that the plaintiff lacks competent evidence to support its claim. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). After the moving party submits adequate affidavits, the nonmoving party must set forth specific facts rebutting the moving party's contentions and disclosing that a genuine issue of material fact exists. *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 12-13, 721 P.2d 1 (1986). When consider-

ing a summary judgment motion, the court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Lybbert*, 141 Wn.2d at 34.

¶24 Mr. Hymas argues that UAP owed him a duty of care under RCW 49.17.060(2) to comply with all WISHA regulations and that this duty was breached by its failure to install guardrails around the trench in which he fell, as required by WAC 296-155-505(6)(a).[5] UAP does not dispute that the WAC provision was not observed, although it argues we need not reach that issue.

¶25 RCW 49.17.060[6] provides:

Each employer:

(1) Shall furnish to each of his or her employees a place of employment free from recognized hazards that are causing or likely to cause serious injury or death to his or her employees . . . and

(2) Shall comply with rules, regulations, and orders promulgated under this chapter.

In *Stute v. P.B.M.C., Inc.*, 114 Wn.2d 454, 457, 788 P.2d 545 (1990), our Supreme Court observed that subsection (1) of the statute imposes a general duty on an employer, owed only to its employees, to protect them from recognized hazards not covered by specific safety regulations, while subsection (2), in light of its textual difference, imposes a specific duty on an employer to comply with WISHA that extends beyond its employees.

¶26 The court also determined as a matter of policy that while the subcontractor owes a duty as well, the prime

---

[5] WAC 296-155-505 provides:

"(6) Guarding of open sided surfaces.

"(a) Every open sided floor, platform or surface four feet or more above adjacent floor or ground level shall be guarded by a standard railing, or the equivalent, as specified in subsection (7)(a) of this section, on all open sides, except where there is entrance to a ramp, stairway, or fixed ladder."

[6] We quote the current version of RCW 49.17.060, which was amended by Laws of 2010, chapter 8, section 12007 to make the language gender neutral.

responsibility for compliance with safety regulations should be borne by the general contractor. "A general contractor's supervisory authority places the general in the best position to ensure compliance with safety regulations." *Id.* at 463.

¶27 Decisions of the Court of Appeals extended the nondelegable duty imposed on general contractors by *Stute* to developer/owners. In *Weinert v. Bronco National Co.*, 58 Wn. App. 692, 696, 795 P.2d 1167 (1990), Division One relied upon the fact that the position of the developer/owner before the court—who had "the same innate overall supervisory authority and [was] in the best position to enforce compliance with safety regulations"—was "so comparable to that of the general contractor in *Stute* that the reasons for the holding in *Stute* apply here." In *Doss v. ITT Rayonier, Inc.*, 60 Wn. App. 125, 128, 803 P.2d 4, *review denied*, 116 Wn.2d 1034 (1991), Division Two based its conclusion that a developer/owner was liable on the facts that the owner met the statutory definition of "employer" and "had innate supervisory authority that gave it control over the workplace." In *Kamla v. Space Needle Corp.*, 105 Wn. App. 123, 19 P.3d 461 (2001), Division One affirmed dismissal of the plaintiff's claim against the owner of the Space Needle on summary judgment, disagreeing with *Doss* in part, and holding that an owner who hires an independent contractor to perform specialized work must exercise authority, not merely retain it, in order to owe a statutory duty to the contractor's employees.

¶28 The Supreme Court accepted review of *Kamla*. Its decision on review is the controlling authority on the liability of jobsite owners to independent contractors' employees under WISHA. It is the basis for our analysis.

¶29 Addressing Mr. Kamla's WISHA claim, the Supreme Court first held that jobsite owners are not per se liable under the statutory requirements of RCW 49.17.060. *Kamla v. Space Needle Corp.*, 147 Wn.2d 114, 123, 52 P.3d 472 (2002). It next held that jobsite owners do not play a

role sufficiently analogous to general contractors to justify imposing upon them the same nondelegable duty to ensure WISHA compliance when there is no general contractor. *Id.* at 123-24.

¶30 The court then turned to the circumstances that would give rise to a duty of WISHA compliance on the part of a jobsite owner extending to subcontractors' employees. It first considered the issue from *Stute*'s policy rationale:

> Although jobsite owners may have a similar degree of authority to control jobsite work conditions, they do not necessarily have a similar degree of knowledge or expertise about WISHA compliant work conditions. Jobsite owners can run the gamut from an owner/developer with the same degree of knowledge about WISHA compliant work conditions as that of a general contractor to a public corporation without any knowledge about WISHA regulations governing a specific trade. Because jobsite owners may not have knowledge about the manner in which a job should be performed or about WISHA compliant work conditions, it is unrealistic to conclude all jobsite owners necessarily control work conditions. Instead, some jobsite owners may reasonably rely on the contractors they hire to ensure WISHA compliance because those jobsite owners cannot practically instruct contractors on how to complete the work safely and properly.

*Id.* at 124-25.

¶31 It then addressed control as the basis for a duty on the part of a jobsite owner. The court had relied in *Stute*, at least in part, upon the concept of retained control, which comes from the common law exception to nonliability of an employer to independent contractors. *Stute*, 114 Wn.2d at 460. For WISHA purposes, *Kamla* adopted the common law concept of control as the exclusive basis on which a jobsite owner acquires a statutory duty under WISHA: "If a jobsite owner does not retain control over the manner in which an independent contractor completes its work, the jobsite owner does not have a duty under WISHA to 'comply with the rules, regulations, and orders promulgated under [chap-

ter 49.17 RCW].' " 147 Wn.2d at 125 (alteration in original) (quoting RCW 49.17.060(2)).

¶32 The court went on to address the type of control which, if retained by an owner, justifies imposing a duty of care, citing approvingly to the *Restatement (Second) of Torts*:

> "[T]he employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way."

*Id.* at 121 (alteration in original) (quoting RESTATEMENT (SECOND) OF TORTS § 414 cmt. c (1965)).

¶33 "Whether a right to control has been retained depends on the parties' contract, the parties' conduct, and other relevant factors." *Phillips v. Kaiser Aluminum & Chem. Corp.*, 74 Wn. App. 741, 750, 875 P.2d 1228 (1994). The proper inquiry is whether the jobsite owner retains the right to direct the manner in which work is performed, not whether it actually exercises that right. *Kamla*, 147 Wn.2d at 121. We therefore look first at the contract provisions identified by the parties as bearing on control. Since no evidentiary issues have been presented that would affect construction of the contract, its construction presents a question of law for the court and not a question of fact for the jury. *Epperly v. City of Seattle*, 65 Wn.2d 777, 784-85, 399 P.2d 591 (1965).

¶34 The most clearly-applicable provision of the parties' contract denies UAP control over the manner in which Narum performs the work. Subsection 8.2.1, under "SUPERVISION AND CONSTRUCTION PROCEDURES," provides in pertinent part:

> The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters.

CP at 96. Mr. Hymas focuses on the initial and preceding phrase, in the same subsection, that "[t]he Contractor shall cooperate fully with the Owner and Architect." *Id.* He contends that this cooperation requirement is tantamount to UAP's retaining an "unrestricted right to require Narum to comply with its instructions." Reply Br. of Appellant at 20. "Cooperate" is defined, however, as "to act or work with another or others to a common end : operate jointly," and "to act together : produce an effect jointly." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 501 (1993). Use of the word "cooperate" does not imply control by UAP, particularly where it appears in the same subsection that provides that Narum has sole responsibility and control. Read in its entirety, even the sentence requiring cooperation negates supervision or direction by UAP; it provides, instead, *"Contractor* shall cooperate fully with the Owner and Architect *and supervise and direct the Work, using the Contractor's best skill and attention."* CP at 96 (emphasis added).

¶35 Sections 15.1 and 15.3 of the contract, dealing with the responsibility for taking safety precautions and operating safety programs in connection with Narum's work, also assign responsibility exclusively to Narum. Mr. Hymas argues, however, that the requirement in section 15.1 that Narum "comply with applicable laws, ordinances, rules, regulations and lawful orders of public authorities bearing on safety of persons and property," CP at 104, constitutes a retention of control by UAP, citing *Afoa* as support.

¶36 In *Afoa,* the employee of a contractor providing ground support services to four airlines at Seattle-Tacoma International Airport was injured while operating a vehicle on the tarmac. He sued the owner of the airport, the Port of Seattle, which had granted his employer a license to per-

form services on the tarmac. He claimed that the port had breached its statutory duty to comply with WISHA, among other duties. 160 Wn. App. at 237.

¶37 Division One of this court reversed the trial court's summary judgment in favor of the port, concluding that the evidence created an issue of material fact regarding whether the port retained or exercised control sufficient to give rise to a duty to Mr. Afoa. It relied largely on the port's license to Mr. Afoa's employer, which required that it comply with "a wide range of [the port's] rules and regulations that appear to govern many details of [the contractor's] operation of its own vehicles." *Id.* at 242. The port's regulations specifically addressed, for example, how much luggage could be towed by a single vehicle and safety protocol for driving vehicles around the tarmac. *Id.* The license also required employees of the contractor to " 'at all times comply with any lawful signal or direction of Port employees' " and prioritized the port's directives over the contractor's directives when the two conflicted. *Id.* at 242-43.

¶38 Mr. Hymas argues that UAP's contract similarly requires Narum to comply with WISHA regulations, which he argues are themselves detailed. But there is a clear distinction: UAP does not dictate the contents of WISHA regulations, so its contract merely requires that Narum comply with independently-existing law, otherwise applicable to Narum, over whose content UAP has no control. In *Afoa*, the port not only required compliance with regulations but dictated their contents. As UAP points out, if it cannot assign responsibility for compliance with safety laws without, by that very act, exercising control, then it can never allocate responsibility for safety to a contractor. The contract's requirement that Narum comply with applicable law is not evidence of the required retention of control over its methods of operation.

¶39 Mr. Hymas finally points to a handful of other contract provisions, including UAP's right to terminate

Narum's contract for any reason, approve subtier contractors, take over work being performed by a contractor, stop or delay the work, order changes to the work, inspect the work, and reject the work, and argues that these provisions individually and/or collectively reserve ultimate control to UAP.

¶40 It is well-settled law that a jobsite owner's retention of the right to inspect and supervise to ensure proper completion of the contract is not sufficient control. *Hennig v. Crosby Grp., Inc.*, 116 Wn.2d 131, 134, 802 P.2d 790 (1991) (quoting *Epperly*, 65 Wn.2d at 785). Nor is its retention of the general right to order the work stopped or resumed, to make suggestions or recommendations that need not necessarily be followed, or to prescribe alterations and deviations. *Kamla*, 147 Wn.2d at 121 (quoting RESTATEMENT § 414 cmt. c). UAP's right to reject work is, like other contract provisions identified in *Hennig*, authority to ensure that a contractor's work "fully complie[s] with the contract provisions." 116 Wn.2d at 134. Its right to approve subcontractors is, as discussed in comments to the *Restatement*, the sort of a right often reserved, but does not mean that Narum was controlled "as to [its] methods of work, or as to operative detail." RESTATEMENT § 414 cmt. c. These rights do not amount, individually or collectively, to such a right of supervision that Narum is not entirely free to do the work in its own way.

¶41 UAP's right to perform the construction work with its own forces, if exercised, implicates *Stute*'s policy rationale because a jobsite owner with its own employees working on the jobsite will have its own obligation for WISHA compliance and will have either knowledge of WISHA or a duty to acquire it.[7] But while *Kamla* discusses *Stute*'s policy rationale, even that discussion identifies control as the

---

[7] We do not understand Mr. Hymas to argue that the rights to terminate the contract or substitute its own workers could be used coercively, to indirectly control the contractors. We would reject the bootstrap argument that the mere possibility that provisions having other, legitimate, objects and purposes could be used coercively amounts to the required retention of control. If a plaintiff

basis for a jobsite owner's liability to its contractors' employees. *See Kamla*, 147 Wn.2d at 124 ("Because jobsite owners may not have knowledge about the manner in which a job should be performed or about WISHA compliant work conditions, *it is unrealistic to conclude all jobsite owners necessarily control work conditions*." (emphasis added)). In addition, UAP's option to use its own forces gives rise to an implied retention of control only if and to the extent it is exercised. It was exercised sparingly by UAP, and at times unrelated to Narum's work. The provision does not negate other provisions of the contract that make clear it is not retaining control over Narum's methods and operations.

¶42 Mr. Hymas offered evidence of respects in which UAP was general contractor-like, such as its history of entertaining bids and selecting, contracting with, and paying specialty subcontractors directly; its setting start and stop dates for multiple contractors with overlapping work; and its using its own employees and terminating a contractor to avoid project delays. Citing *Weinert* and *Doss*, he argues that UAP's conduct was sufficiently analogous to that of a general contractor to justify imposing a duty. But again, *Kamla*, which is controlling, holds that whether a jobsite owner owes a statutory duty to an independent contractor's employee turns exclusively on whether it assumes the type of control that removes the owner from the general rule of nonliability at common law. For purposes of statutory liability, the owner's resemblance to a general contractor is, at best, only one piece of evidence bearing on whether it could or would have elected to retain control.

¶43 Turning to actual conduct, Mr. Hymas points to UAP's expression of concern about the deep "leg pit," in response to which Narum barricaded the area; to Mr. Jones's deposition testimony that he would have raised a safety concern with Narum if he thought someone might be

presented evidence that a jobsite owner had actually used such provisions to control the contractor's performance, that would be different. There is no such evidence here.

injured; and to Mr. Narum's testimony that if UAP supervisors had asked him to change something Narum was doing because it was unsafe, he would have followed UAP's instructions. UAP points out that Mr. Jones was clear that he did not believe he could *require* Narum's employees to take safety precautions; he testified, "[I]f it's an employee working for me, it's a totally different situation." CP at 88.

¶44  The fact that UAP discussed one safety concern with Narum and that Narum thereafter took action is not sufficient, in light of provisions of the contract and other evidence, to create a genuine issue of fact whether UAP had the right to dictate Narum's safety control. The parties' contract explicitly allowed UAP to express a concern without thereby upsetting the allocation of responsibility for safety to Narum. CP at 104 (section 15.3, providing in part that "[a]ny inspections or observations by the Owner or the Architect are solely for the benefit of the Owner and shall not create any duties or obligations to anyone else"). In light of this explicit provision, we need not address whether this evidence would otherwise be sufficient to raise a jury issue.

¶45  Viewing the evidence in the light most favorable to Mr. Hymas, he did not present evidence sufficient to raise a jury question on the required element of a statutory duty owed to him by UAP.

## II

¶46  Mr. Hymas also argues that UAP breached its duty of care owed him as a business invitee upon its premises. UAP responds that it tendered safe premises to Narum and is not liable for Narum's negligence when performing its work.

¶47  The legal standard applicable to this issue is well settled. The "legal duty owed by a landowner to a person entering the premises depends on whether the entrant [is] a trespasser, licensee, or invitee." *Iwai v. State*, 129 Wn.2d 84, 90-91, 915 P.2d 1089 (1996). Employees of

independent contractors hired by landowners are invitees on the landowners' premises. *Meyers v. Syndicate Heat & Power Co.*, 47 Wash. 48, 91 P. 549 (1907); *Epperly*, 65 Wn.2d at 786.

¶48 The obvious character of a dangerous condition bears on duty and liability. It is undisputed that Mr. Hymas had worked at the Plymouth work site at least 20 times prior to his accident, with at least 10 to 12 of those occasions within the month prior, and that he had worked near the trench and recognized it as a dangerous condition several months before his accident.

¶49 Washington has adopted sections 343 and 343A of the *Restatement*, which address the duty owed invitees by a landowner with respect to a dangerous condition on its land. *Kamla*, 147 Wn.2d at 125-26. Section 343 provides:

"A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

"(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

"(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

"(c) fails to exercise reasonable care to protect them against the danger."

*Id.* at 125-26 (quoting Restatement § 343, at 215-16). Additionally, section 343A provides:

" 'A possessor of land is not liable to his [or her] invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.' "

*Id.* at 126 (emphasis omitted) (alteration in original) (quoting *Iwai*, 129 Wn.2d at 94 (quoting Restatement § 343A, at 218)).

¶50 A landowner's responsibility for the condition of the land does not make the landowner liable for the negligent acts or omissions of an independent contractor. *Lamborn v. Phillips Pac. Chem. Co.*, 89 Wn.2d 701, 708, 575 P.2d 215 (1978). In other words, "it does not make the landowner liable where the work of an independent contractor 'is of an unsafe nature or the defects are due to the imperfect and negligent work of the contractor himself'." *Phillips*, 74 Wn. App. at 748 (quoting *Epperly*, 65 Wn.2d at 786).

¶51 In *Golding v. United Homes Corp.*, 6 Wn. App. 707, 710, 495 P.2d 1040 (1972) Division Two of our court was called upon to consider "the nature of the duty owing under sections 343 and 343A by a possessor of land . . . to an invitee engaged in the performance of inherently dangerous work on the premises when the possessor exercises no control or direction over the performance of the contracted work."

¶52 The case was brought by an independent contractor's employee killed while laying pipe, when the wall of a trench dug by his employer collapsed. *Id.* at 708. His estate sued the landowner, claiming that it breached the duty owed him as a business invitee by failing to warn about the instability of the ground. *Id.* In affirming the trial court's grant of summary judgment in favor of the landowner, the court noted that the landowner

> did not supervise the activities of the independent contractor or his workman and did nothing affirmatively to increase the risk of harm inherent within the nature of the work. The premises were safe when turned over to the contractor, and knowledge concerning the nature and condition of the soil upon the premises and the failure to take adequate safety precautions thereafter, was as available to the contractor and his workmen as to the defendant.

*Id.* at 711-12. It also reaffirmed the general rule stated in *Epperly* that the owner of premises owes to the servant of the independent contractor employed to perform work on

his premises the duty to avoid endangering him by the owner's own negligence or affirmative act, but owes no duty to protect him from the negligence of his own master. *Id.* at 712 (citing *Epperly*, 65 Wn.2d at 785).

¶53 Mr. Hymas strenuously insists that most of the cases relied upon by UAP for landowner nonliability to an independent contractor's employee predate our Supreme Court's adoption of *Restatement* section 343A in *Tincani*, 124 Wn.2d at 146. He argues that in relying on these earlier cases, UAP is essentially asking us not to apply sections 343 and 343A. But the principles of common law reflected in sections 343 and 343A do not displace common law limitations on a principal's liability to an independent contractor's employees, which are themselves recognized at, e.g., *Restatement* §§ 409, 413, and 414, as well as in the cases relied upon by UAP. Both sets of principles are recognized in Washington cases and each operates in its proper sphere.

¶54 The scope of sections 343 and 343A of the *Restatement* extends beyond independent contractors and their principals; it encompasses the liability of every class of land possessor to every conceivable person invited onto property—and for that matter, property as varied as a business establishment, a home, or raw land. Sections 343 and 343A focus on the land possessor's duty to prepare the land, or through warnings, the invitee, for entry of an invitee. They do not deal with conditions an invitee might create and over which it might exercise control during its presence.

¶55 Sections 343 and 343A recognize that "[i]n determining the extent of preparation which an invitee is entitled to expect to be made for his protection, the nature of the land and the purposes for which it is used are of great importance." RESTATEMENT § 343 cmt. e. By way of example, the comments observe that one who goes on business to the executive offices in a factory "is entitled to expect that the possessor will exercise reasonable care to secure his visitor's safety," yet he is not entitled to expect that special preparation will be made for his safety if he is invited to go

on business into the factory itself. In entering that work-place, the invitee "is entitled to expect only such safety as he would find in a properly conducted factory." *Id.*

¶56 Comments to sections 343 and 343A nowhere suggest that a landowner who has prepared its premises for entry by an invitee and protected the invitee from existing hazards has a duty to superintend the activities of the contractor following its arrival and commencement of work. Comment e to section 343A states:

> In the ordinary case, an invitee who enters land is entitled to nothing more than knowledge of the conditions and dangers he will encounter if he comes. If he knows the actual conditions, and the activities carried on, and the dangers involved in either, he is free to make an intelligent choice as to whether the advantage to be gained is sufficient to justify him in incurring the risk by entering or remaining on the land. *The possessor of the land may reasonably assume that he will protect himself by the exercise of ordinary care, or that he will voluntarily assume the risk of harm if he does not succeed in doing so.*

RESTATEMENT § 343A cmt. e (emphasis added). Where the landowner has discharged its obligation to prepare its land and warn or otherwise protect an independent contractor-invitee, it is other principles of common law, reflected in the *Restatement* at sections 409-429, that address the relative responsibilities of the owner and the independent contractor for the independent contractor's activities.

¶57 Viewed from the perspective of section 343A, common law governing the relative liabilities of the owner and contractor informs what the landowner "should anticipate." UAP turned raw land over to Narum. Narum dug and framed the trench. Mr. Hymas and Narum were well aware of the obvious dangerous condition, a five-foot-deep trench approaching the area of a football field. Given Narum's unchallenged competence and 43 years of performing concrete construction work, Mr. Hymas's 12 years of experience working as a concrete pump operator, Narum's express agreement to comply with safety laws and regulations, and

Narum's and Mr. Hymas's awareness of the hazard, no reasonable trier of fact could find that UAP should have anticipated that Narum would allow Mr. Hymas to perform work, and especially distracting work, adjacent to the trench, without protecting him in some fashion from a fall. *See Kamla*, 147 Wn.2d at 127 (affirming summary judgment in favor of the landowner where the contractor's injured employee had experience working on the site and was acutely aware of the danger posed by an obvious hazard).

¶58 Mr. Hymas nonetheless argues that *Arnold v. Saberhagen Holdings, Inc.*, 157 Wn. App. 649, 653, 240 P.3d 162 (2010), *review denied*, 171 Wn.2d 1012 (2011) correctly limits analysis of liability to the principles set forth in *Restatement* section 343A and supports his position that cases such as *Epperly, Lamborn, Phillips*, and *Golding* are inapposite. *Arnold* involved the claims of the wife and son of an insulator at Lockheed Shipbuilding Company's shipyard, exposed to the hazard of " 'take home exposure' " to asbestos fibers through Lockheed's alleged breach of duty. *Id.* The court reversed the summary judgment dismissal of the plaintiffs' claims against Lockheed as owner of the shipyard. But its decision is consistent with our analysis and prior cases; it recounts substantial summary judgment evidence that Lockheed supervisors were on site daily, providing the insulation material to its contractors' employees that created the hazard, and even evidence that Lockheed not only retained actual control over safety but may have retained even the contractual right of control. Given the clearly distinguishable role assumed by Lockheed, a question of material fact was presented as to its ability to anticipate harm to its contractors' employees and family members exposed to asbestos fibers on their clothing.

¶59 Mr. Hymas did not present evidence demonstrating a genuine issue of breach of UAP's duty owed him as an

invitee, and the trial court properly dismissed his premises liability claim.

¶60 Affirmed.

KULIK, C.J., and KORSMO, J., concur.

Review denied at 175 Wn.2d 1006 (2012).