IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| Kevin Grudzinski, | ) | No. 30795-6-III |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| Randy Grudzinski and | ) | |
| Nancy Grudzinski, husband and wife, | ) | |
| | ) | |
| Respondents. | ) | |

KULIK, J. — Kevin Grudzinski appeals summary dismissal of claims against his brother Randy Grudzinski. The claims stem from Randy dumping demolition debris on land that Kevin later inherited.[1] Kevin alleged that the debris was toxic, devalued the land, and clouded title. He sued Randy for relief under the Model Toxics Control Act (MTCA), chapter 70.105D RCW, chapter 82.21 RCW; damages for negligent injury to property; an injunction ordering Randy to clean up the land; and a declaration quieting title. Eleven days before trial, the court dismissed all of the claims on summary judgment.

---

[1] For clarity, we will refer to Kevin Grudzinski and Randy Grudzinski by first

We conclude that there was no release of hazardous substances and the court properly dismissed the remaining claims. Accordingly, we affirm.

## FACTS

Elsie Grudzinski was the mother of two sons, Kevin Grudzinski and Randy Grudzinski. Ms. Grudzinski owned 57 acres in Walla Walla. Parts of that acreage are known as Lots 1, 3, and 4. Those lots are at issue here.

### Debris Disposal on Lots 1, 3, and 4

Randy owned a demolition and excavation company called Randy Grudzinski, Inc. (RGI). He planned to use Lot 1 as a base of operations for RGI.[2] He intended to store his equipment there. He began dumping debris, which included large pieces of asphalt and concrete, on Lot 1. However, the plan to make it a base of operations never materialized.

While dumping a load of excavation material on Lot 1, an "end-dump trailer" tipped over on its side. Clerk's Papers (CP) at 118. It remained tipped over for several months. During that time, fluid leaked out of the trailer and onto the soil. Kevin believed that the liquid was hydraulic fluid. The record does not reveal what the fluid was made of or whether it was cleaned up.

---

name. We intend no disrespect.

[2] The parties submitted evidence on and argued about whether Ms. Grudzinski gave Randy permission to use her land and, if so, what the scope of that permission was.

Later, RGI had an excavation contract with Apollo, Inc. Apollo, Inc. was the general contractor on the "Myra Road project." CP at 146. According to Randy, he dumped "asphalt, concrete, vegetation, tree stumps and pit-run gravel" on his mother's land during the project. CP at 52. He dumped most of the debris on Lot 4, but also dumped some on Lot 3. Apollo, Inc. itself was dumping debris on Ms. Grudzinski's land. She signed a document giving Apollo, Inc. permission to dump dirt and vegetation on her land, but not "[m]aterials from Stubblefield property."[3] CP at 55.

The "Stubblefield property" refers to the former Stubblefield Salvage Yard. It is a hazardous site awaiting clean up by the Department of Ecology. The Myra Road project went through a portion of the salvage yard. As a result, some of the salvage yard was excavated.

According to Randy, debris from the Stubblefield Salvage Yard was disposed of on another part of the yard, which Randy and a business partner eventually bought. Randy knew that Stubblefield Salvage Yard's debris was there because he saw Apollo moving loads of it and there "was truckloads and truckloads stacked that [he] had to deal

---

However, Ms. Grudzinski's permission is irrelevant to the issues addressed here.

[3] What land she gave them permission to dump on is unclear. The letter that she signed authorizing the dumping says that Apollo may dump on "parcel number 350725220004 at 531 Hatch Street." CP at 55. That parcel number is Lot 4, but 531 Hatch Street was Ms. Grudzinski's residence, which was on a different parcel.

3

with" when he bought the land. CP at 187. He indicated that the Environmental Protection Agency had tested his portion of the yard and concluded that it was not contaminated.

Kevin, however, suggested that Stubblefield Salvage Yard debris ended up on Ms. Grudzinski's land. Although he did not actually see debris from the Stubblefield being dumped on Ms. Grudzinski's land, he did see Apollo's and RGI's trucks loaded with Stubblefield debris and traveling toward Lots 3 and 4. According to Kevin, the debris on Lots 3 and 4 included "iron pipe, cast iron manhole covers, cast iron manhole rings, and PVC pipe," and a "concrete manhole ring." CP at 118. None of the land was tested for the presence of hazardous substances.

*Ms. Grudzinski's Estate*

Ms. Grudzinski died in 2009 and left her estate to Kevin and Randy. In her will, she indicated,

> I am concerned that my children will argue over the disposition of my estate and management of my estate after my death. . . . [S]hould either of my children contest the terms of my Will or the manner in which my Personal Representative is handling the resolution of my estate, said child shall receive the sum of ONE DOLLAR ($1.00) and otherwise receive nothing under this Will.

CP at 31. She devised and bequeathed 60 percent of the estate's residue to Kevin and 40 percent to Randy. The residue included Lots 1, 3, and 4.

4

The court appointed Thomas Sawatzki personal representative. Instead of selling the land and dividing the proceeds, Mr. Sawatzki divided the land between Randy and Kevin. Kevin ended up with Lots 1, 3, and 4.

Mr. Sawatzki knew that those lots had demolition debris on them. He concluded that the debris did not reduce the land's value, but got several estimates on the cost to clean up the debris. The estimates indicated that it would cost $15,000 to $43,700 to remove the debris. Based on those figures, he decided to give Kevin a setoff of $25,000 worth of additional estate property.[4] According to Kevin, rather than giving Kevin anything of value, Mr. Sawatzki artificially inflated the value of personal property already distributed to Kevin.

*Procedural History*

The Walla Walla County Health Department ordered that Kevin remove the debris and properly dispose of it. Nobody had a permit to dump excavation debris on Ms. Grudzinski's land and the dumping was prohibited by a zoning regulation. Nothing in the record shows that Walla Walla County has enforced its order.

---

[4] The record also suggests that Kevin may have received $43,700 rather than $25,000. However, Randy agreed at the summary judgment hearing and in his appellate brief that Kevin received $25,000.

5

Kevin did not clean up the land, but he did sue Randy for the cost of cleanup. He claimed that he was entitled to relief under the MTCA, damages for negligent injury to real property, equitable relief ordering Randy to clean up the property, a declaration quieting title, and a declaration of the legal status of an easement for well water.

On February 16, 2012, Randy moved for summary judgment on every claim. The summary judgment hearing was set for March 15, 2012, which was 11 days before trial. Kevin moved to strike the summary judgment hearing as untimely. He argued that it was prejudicial because it would be impossible to prepare for the summary judgment hearing and trial 11 days later. The court denied the motion.

At the summary judgment hearing, Kevin conceded that hardened asphalt could not support an MTCA claim. Counsel for Kevin explained that the MTCA claim did not include Lot 1 "because of the nature of the material dumped there, which are hardened asphalt, large volume of trees, tree trunks, and tree stumps and concrete, so forth. None of that is going to be a MTCA claim." Report of Proceedings (RP) at 24.

The court granted the motion and dismissed every claim except the easement-related claim. It concluded that there was insufficient evidence of hazardous substances to support the MTCA claim, Randy did not owe a duty to Kevin or that Ms. Grudzinski's negligence claim did not pass to Kevin, that the equities did not support a declaratory

6

relief, and that there was no cloud on the title. Kevin appeals.

## ANALYSIS

We review orders on summary judgment de novo. *Michak v. Transnation Title Ins. Co.*, 148 Wn.2d 788, 794-95, 64 P.3d 22 (2003). Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." CR 56(c). We consider all facts and all reasonable inferences from those facts in a light most favorable to the nonmoving party. *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 922, 296 P.3d 860 (2013). A genuine issue of material fact exists when reasonable minds could disagree about the facts controlling the outcome of litigation. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

### *MTCA Claim*

The MTCA's goal is to protect human and environmental health from irresponsible use and disposal of hazardous substances. RCW 70.105D.010. The MTCA allows the Department of Ecology to recover "all remedial action costs and for all natural resource damages resulting from the releases or threatened releases of hazardous substances." RCW 70.105D.040(2). Additionally, a landowner liable for clean up costs

may seek contribution or declaratory relief from other liable parties. RCW 70.105D.040(1)(a), .080. To support a private MTCA claim, the evidence must show that (1) the plaintiff is responsible for clean up costs, (2) the defendant is a liable party, (3) the property is a "facility," and (4) there is a release or threatened release of a hazardous substance. RCW 70.105D.040(1), .080. Once the court concludes that the plaintiff may recover, it determines the measure of recovery using equitable factors and limits the recovery to fees and expenses that are the "substantial equivalent of a [Department of Ecology]-supervised remedial action." RCW 70.105D.080.

Here, the parties dispute whether there was a release of hazardous substances, whether Randy is a liable party, and whether Kevin is entitled to relief. Because we conclude that there was no release of hazardous substances, we do not reach the remaining issues.

Kevin argues that the trial court erred by concluding that there was no evidence of hazardous substances on the land. "Hazardous substance" is statutorily defined. RCW 70.105D.020(10). It includes many substances, but the substances most relevant here are "petroleum products" and "extremely hazardous waste." *See* RCW 70.105D.020(10)(a), (d). "Extremely hazardous waste" is any waste "[i]f disposed of at a disposal site in such quantities as would present an extreme hazard to human beings or the environment."

8

RCW 70.105.010(7)(b). Other hazardous substances include those that are highly toxic to or "may affect the genetic make-up of human beings or wildlife," RCW 70.105.010(7)(a)(i); have "short-lived, toxic properties that may cause death, injury, or illness," are "mutagenic, teratogenic, or carcinogenic," RCW 70.105.010(1)(a); or are "corrosive, explosive, [or] flammable." RCW 70.105.010(1)(b).

Kevin contends that there was evidence of hazardous substances on the land. Specifically, he contends that the Stubblefield Salvage Yard debris, hardened asphalt, and hydraulic fluid are all hazardous substances.

*Stubblefield Salvage Yard Material.* Kevin contends that there was evidence that this material was a hazardous substance because the evidence showed that the Stubblefield Salvage Yard was awaiting clean up by the Department of Ecology and the debris from the salvage yard was on Lots 3 and 4. From that evidence, he contends the court can infer that there are hazardous substances on the land. Randy responds that there is no way to know whether hazardous substances are on the land because Kevin failed to test the land for hazardous substances.

The evidence shows that RGI worked on the Myra Road project with Apollo, the Myra Road project went through the salvage yard; RGI and Apollo trucks traveled toward Lots 3 and 4 while loaded with salvage yard debris; and that the salvage yard was

9

awaiting clean up by the Department of Ecology. By all accounts, the debris on Lots 3 and 4 consisted of asphalt, concrete, vegetation, tree stumps, gravel, cast iron, and PVC.

Viewed in a light most favorable to Kevin, this court could infer that material from the Stubblefield Salvage Yard was on the land. However, this court cannot infer that the material is hazardous. Perhaps the material would be hazardous if it was in such a quantity as to present an extreme hazard to human beings or the environment. *See* RCW 70.105.010(7)(b). However, there is no evidence to suggest that. Additionally, the materials were not tested for contamination from hazardous substances that might be, for example, mutagenic, teratogenic, carcinogenic, corrosive, explosive, or flammable. *See* RCW 70.105.010(1)(a), (b).

The evidence does not support the conclusion that any debris from the Stubblefield Salvage Yard is hazardous.

*Hydraulic Fluid.* Next, Kevin argues that hydraulic fluid is a hazardous substance. His argument, however, consists only of a conclusory statement that hydraulic fluid is a hazardous substance. That statement relies on the assumption that hydraulic fluid is a petroleum product. Petroleum products are hazardous substances. RCW 70.105D.020(10)(d).

10

The evidence showed that hydraulic fluid spilled onto the soil, but not that the fluid was a petroleum product or any other kind of hazardous substance. Indeed, there are at least four types of hydraulic fluids and only one type is a petroleum product.[5] *See* U.S. DEP'T OF HEALTH & HUMAN SERVICES, PUBLIC HEALTH SERV., AGENCY FOR TOXIC SUBSTANCES & DISEASE REGISTRY, TOXICOLOGICAL PROFILE FOR HYDRAULIC FLUIDS at 9 (Sept. 1997) (there are mineral oil, organophosphate ester, and polyalphaolefin hydraulic fluids);[6] Dawn Lyons-Johnson, *Biodegradable Plant-Based Hydraulic Fluid*, AGRICULTURAL RESEARCH, Nov. 1998, at 9 (there are plant-based hydraulic fluids).[7]

*Hardened Asphalt.* On appeal, Kevin also argues that hardened asphalt is a hazardous substance. However, this court may refuse to review issues not raised in the trial court. RAP 2.5(a). At the summary judgment hearing, Kevin conceded that hardened asphalt could not contribute to his MTCA claim. There, Kevin's counsel explained that the MTCA claim did not include Lot 1 "because of the nature of the materials dumped there, which are *hardened asphalt*, large volume of trees, tree trunks,

---

[5] This court may take judicial notice of facts "not subject to reasonable dispute." ER 201(b).

[6] *Available at* http://www.atsdr.cdc.gov/toxprofiles/tp99.pdf.

[7] *Available at* http://www.ars.usda.gov/is/ar/archive/nov98/oil1198.pdf.

11

and tree stumps and concrete, so forth. *None of that is going to be a MTCA claim.*"
RP at 24 (emphasis added). Because Kevin did not preserve this issue for appeal, we
need not address it. *See* RAP 2.5(a).

In sum, Kevin failed to present any evidence of hazardous substances on the land.
There being no genuine issue of material fact on that element, Randy was entitled to
summary judgment as a matter of law. *See* CR 56(c).

*Negligence*

Kevin next argues that the trial court incorrectly dismissed his negligence claim.
A plaintiff raising negligence must establish four elements: (1) a duty owed to the
plaintiff, (2) breach of that duty by the defendant, (3) resulting injury, and (4) proximate
cause between the breach and the injury. *Tincani v. Inland Empire Zoological Soc'y*, 124
Wn.2d 121, 127-28, 875 P.2d 621 (1994). Whether the defendant owed a duty to the
plaintiff is a threshold question. *Munich v. Skagit Emergency Commc'ns Ctr.*, 175 Wn.2d
871, 877, 288 P.3d 328 (2012). If the existence of a duty does not depend on disputed
facts and the plaintiff does not establish that a duty exists, then summary judgment is
appropriate. *See Hymas v. UAP Distrib., Inc.*, 167 Wn. App. 136, 150, 272 P.3d 889,
*review denied*, 175 Wn.2d 1006 (2012) (summary judgment inappropriate when duty
depends on disputed facts); *Jackson v. City of Seattle*, 158 Wn. App. 647, 652, 244 P.3d

12

425 (2010) (burden of establishing duty is on the plaintiff).

Kevin contends that Randy owed him a duty because Randy owed Ms. Grudzinski a duty and now Kevin owns her land. Randy responds that he did not owe Kevin a duty because Kevin did not own the land at the time of Randy's alleged negligent conduct.

While the issue may certainly be framed as one of duty, it might better be framed as one of standing: Does Kevin have standing to assert Ms. Grudzinski's negligence claim? Standing is a common law doctrine that prohibits a plaintiff from raising the legal rights of another. *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 150 Wn.2d 791, 802, 83 P.3d 419 (2004). Generally, a person has standing to raise a claim for injury to real property only if that person owned the real property at the time of the injury. *Powell v. Superior Portland Cement, Inc.*, 15 Wn.2d 14, 18, 129 P.2d 536 (1942) ("[T]he right of action, if any, respondent's grantor may have had for damages to that property . . . did not pass to respondent grantee with conveyance of the property, needs no citation of sustaining authority."); *Scott v. Elliot*, 253 Or. 168, 181, 451 P.2d 474 (1969); *West v. Brenntag Sw., Inc.*, 168 S.W.3d 327, 333 (Tex. App. 2005); *Beach St. Corp. v. A.P. Constr. Co.*, 441 Pa. Super. 639, 641-42, 658 A.2d 379 (1995); *Frank C. Minvielle, LLC v. IMC Global Operations, Inc.*, 380 F. Supp. 2d 755, 771-72 (W.D. La. 2004). Kevin does not have standing to assert Ms. Grudzinski's claim.

Kevin also contends that he is entitled to assert Ms. Grudzinski's negligence claim because of this state's survival statute. *See* RCW 4.20.046(1). Under the survival statute, the claim of a decedent survives and passes to the personal representative. *Id.* The statute provides:

> All causes of action by a person or persons against another person or persons shall survive *to the personal representatives of the former* and against the personal representatives of the latter, whether such actions arise on contract or otherwise, and whether or not such actions would have survived at the common law or prior to the date of enactment of this section.

*Id.* (emphasis added).

There are two problems with Kevin's argument. First, Mr. Sawatzki—not Kevin—was Ms. Grudzinski's personal representative. He had the discretion to sue Randy, but chose not to do so. *See* RCW 11.48.010. Second, the record does not show that Mr. Sawatzki distributed a negligence claim to Kevin. The claim is not listed in the inventory and appraisal of the estate or as an asset to be distributed to Kevin. Kevin points out that Mr. Sawatzki did not formally release the claim either and it therefore remains an undistributed asset of the estate. If so, a trial court may reissue letters of administration to dispose of the claim. *See* RCW 11.76.250. But in the meantime, Ms. Grudzinski's negligence claim does not belong to Kevin.

The court correctly dismissed Kevin's negligence claim.

14

*Equitable and Quiet Title Claims*

Next, Kevin argues that the trial court incorrectly dismissed his equitable and quiet title claims. Both claims sought an order requiring Randy to clean up the land to the satisfaction of Walla Walla County and Kevin.

Kevin contends that the trial court erred because he raised a genuine issue of material fact as to whether Mr. Sawatzki adequately compensated him for the cost of cleaning up the land. However, that factual issue is immaterial to the court's conclusion that Kevin was not entitled to equitable relief. The court observed that Ms. Grudzinski's will appointed a neutral third-party personal representative and contained a no-contest clause. The court concluded that the will evidenced Ms. Grudzinski's intent to avoid conflict between Randy and Kevin. It further concluded that Kevin's suit was an attempt to circumvent the terms of the will and allowing Kevin to do so would be inequitable. Even assuming that Mr. Sawatzki's setoff was inadequate, the court's conclusion would apply. There was no genuine issue of material fact that prevented summary judgment on this issue.

Kevin also contends that the trial court erred by dismissing the claims without citing to any authority. However, we will not consider arguments that are not supported by citations to authority. RAP 10.3(a)(6); *Joy v. Dep't of Labor & Indus.*, 170 Wn. App.

15

614, 629, 285 P.3d 187 (2012), *review denied*, 176 Wn.2d 1021 (2013). Because Kevin does not cite to any authority to support his argument, this court will not consider it.

There is no basis to conclude that the court erred by dismissing the equitable and quiet title claims.

*Timeliness of Summary Judgment Motion*

Finally, Kevin contends that the court erred by hearing the summary judgment motion untimely. A motion for summary judgment "shall be heard more than 14 calendar days before the date set for trial unless leave of court is granted to allow otherwise." CR 56(c). An order shortening time between a summary judgment hearing and trial is reviewed for an abuse of discretion. *State ex rel. Citizens Against Tolls v. Murphy*, 151 Wn.2d 226, 236, 88 P.3d 375 (2004). Shortening time is an abuse of discretion if it prejudiced the nonmoving party. *Id.* To demonstrate prejudice, the nonmoving party "must show a lack of actual notice, a lack of time to prepare for the motion, and no opportunity to submit case authority or provide countervailing oral argument." *Id.* at 236-37.

In *Citizens Against Tolls*, the plaintiff argued that a summary judgment hearing eight days prior to trial was prejudicial because it had insufficient time to collect evidence or file a CR 56(f) motion. *Id.*; *see* CR 56(f) (the court may refuse to consider a summary

16

judgment motion if the nonmoving party cannot present affidavit facts to oppose the summary judgment motion). The court concluded that there was no prejudice because the plaintiff knew about the issues that might lead to summary judgment months before the hearing and the uncollected evidence had no value. *Id.* at 238.

Here, Kevin argued that shortening time prejudiced him because it would be too hard to prepare for summary judgment and then trial 11 days later. On appeal, he further explains that he did not have time to file a CR 56(f) motion or conduct more discovery to address the issues raised by Randy. However, the record shows that Kevin had more than one month to file a CR 56(f) motion, prepare for summary judgment, and then 11 more days to prepare for trial. He also never explained what type of evidence he needed to obtain through additional discovery. Like in *Citizens Against Tolls*, he has not shown prejudice.

The court did not abuse its discretion by hearing the summary judgment motion 11 days before trial.

No. 30795-6-III
*Grudzinski v. Grudzinski*

We affirm the decision of the trial court.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Kulik, J.

WE CONCUR:

_____
Korsmo, C.J.

_____
Siddoway, J.

18