Argued and submitted March 22, 2018, affirmed on appeal and cross-appeal
August 26, 2020

Alice J. GOLIK,
individually and as personal representative
of the Estate of Robert J. Golik,
*Plaintiff-Appellant*
*Cross-Respondent,*

*v.*

CBS CORPORATION,
fka Viacom, Inc., a Delaware corporation,
sued as successor by merger with CBS Corporation,
fka Westinghouse Electric Corporation, et al.;
Weyerhaeuser Company, a Washington corporation;
and Longview Fibre Paper and Packaging, Inc.,
a Washington corporation,
*Defendants,*

*and*

GEORGIA-PACIFIC CONSUMERS
PRODUCTS (CAMAS), LLC,
a Washington corporation,
sued individually and as successor-in-interest
to Crown Zellerbach Corp.,
*Defendant-Respondent*
*Cross-Appellant.*

Multnomah County Circuit Court
130811192; A160322

472 P3d 778

In this civil case, a jury found Georgia Pacific Consumer Products (Camas), LLC, as successor to Crown Zellerbach Corp., owner of a paper mill in Camas, Washington, liable for Robert Golik's death from mesothelioma. After the trial court entered a general judgment in favor of plaintiff, defendant received, for the first time, certain documents that it had requested during discovery, which provided detail regarding some of Golik's other exposures to asbestos. Based on one of the newly obtained documents, the trial court entered an order granting defendant's motion for a new trial. In the same order, the court denied defendant's motion for judgment notwithstanding the verdict (JNOV). Plaintiff appeals the new-trial order and the subsequent order vacating the general judgment. Defendant cross-appeals, assigning error to the court's denial of its JNOV motion, among other things. *Held*: The court did not err in ordering a new trial based on misconduct of the prevailing party or in denying defendant's JNOV motion.

Affirmed on appeal and cross-appeal.

Karin Johana Immergut, Judge. (Order-May 28, 2015; Judgment-June 30, 2015; Order-August 14, 2015)

Nan G. Waller, Judge. (Order-August 26, 2015)

Kathryn H. Clarke argued the cause and filed the reply brief for appellant-cross-respondent. Also on the opening brief was R. Walker Humphrey II, Texas.

R. Daniel Lindahl argued the cause for respondent-cross-appellant Weyerhaeuser Company. Also on the briefs were Bullivant Houser Bailey PC, and Joshua J. Metcalf, Nick C. Giallourakis, and Forman Watkins & Kurtz LLP, Mississippi.

Susan Marmaduke argued the cause for respondent-cross-appellant Georgia-Pacific Consumer Products (Camas), LLC. Also on the briefs were J. Aaron Landau and Harrang Long Gary Rudnick P.C.

J. Michael Mattingly, Kevin Clonts, and Rizzo Mattingly Bosworth PC filed the briefs for respondent-cross-appellant Longview Fibre Paper and Packaging, Inc.

Before Lagesen, Presiding Judge, and DeVore, Judge, and James, Judge.

JAMES, J.

Affirmed on appeal and cross-appeal.

**JAMES, J.**

In this civil case, a jury found defendant Georgia Pacific Consumer Products (Camas), LLC, as successor to Crown Zellerbach Corp., owner of a paper mill in Camas, Washington, liable for Robert Golik's death from mesothelioma.[1] The trial court entered a general judgment in favor of Golik's wife, on her own behalf and as personal representative of Golik's estate, and their children, as beneficiaries of the estate. After trial, defendant received, for the first time, certain documents that it had requested during discovery, which provided detail regarding some of Golik's other exposures to asbestos. Based on one of the newly obtained documents, the trial court entered an order granting defendant's motion for a new trial on the grounds of misconduct, ORCP 64 B(2), and newly discovered evidence, ORCP 64 B(4). In the same order, which we refer to as the new-trial order, the court denied defendant's motion for a new trial to the extent that it was based on grounds other than the newly obtained documents and also denied defendant's motion for judgment notwithstanding the verdict (JNOV), which was based on defendant's earlier motion for directed verdict. The court then vacated the judgment in favor of plaintiff.

Plaintiff appeals the new-trial order and the order vacating the judgment, contending that the court erred in granting a new trial under both ORCP 64 B(2) and ORCP 64 B(4) and, consequently, also erred in vacating the judgment. Defendant cross-appeals the new-trial order, the general judgment, and an order in which the court denied defendant's post-trial motion to reduce the verdict, assigning error to the court's denial of its motion for JNOV and also raising assignments of error regarding the trial court's rulings at trial and its denial of defendant's motion to reduce the verdict.[2]

---

[1] For ease of reference, throughout this opinion, we refer to both Georgia Pacific and Crown Zellerbach as "defendant."

The jury also found Weyerhaueser Company, and Longview Fibre Paper and Packaging, Inc., liable. Weyerhaeuser and Longview Fibre were parties on appeal and filed briefs, but they are now no longer parties. The case originally involved many additional defendants, but, at this point, the only remaining defendant, respondent on appeal, is Georgia Pacific.

[2] On appeal, defendant moved for a summary determination of the appealability of the court's order granting its motions for new trial and denying its

We begin by considering plaintiff's appeal. As explained below, we conclude that the court did not err in ordering a new trial based on misconduct, ORCP 64 B(2). Because that is sufficient to support the court's new-trial order and the order vacating the judgment, we need not, and do not, consider whether the court correctly ruled that a new trial was justified under ORCP 64 B(4).

Turning to defendant's cross-appeal, we reject defendant's contention that the trial court erred in denying its JNOV motion on either of plaintiff's claims. As noted above, 306 Or App at 204 n 2, we do not address defendant's assignments of error related to the general judgment because that judgment correctly has been vacated and, consequently, those assignments are moot. We affirm on appeal and cross-appeal.

## PLAINTIFF'S APPEAL

We begin by summarizing the evidence presented at trial and the procedural history necessary to evaluate the court's ruling on the new trial motion. Further below,

JNOV motions. The Appellate Commissioner initially determined that defendant could not challenge the denial of its JNOV motions in a cross-appeal (as opposed to a cross-assignment of error). On reconsideration, however, the commissioner determined that defendant could cross-appeal on that ground.

We agree that the new-trial order was appealable. ORS 19.205(3) ("An order that is made in the action after a general judgment is entered and that affects a substantial right, including an order granting a new trial, may be appealed in the same manner as provided in this chapter for judgments."); ORS 19.245(1) (with exceptions not applicable here, "any party to a judgment may appeal from the judgment"). However, because, as explained in the text, we reject plaintiff's arguments on appeal and conclude that the trial court properly ordered a new trial and vacated the general judgment, the general judgment has no effect. Consequently, defendant's assignments of error based on the general judgment are moot because our decision would have "no practical effect on the rights of the parties." *State v. Walraven*, 282 Or App 649, 655, 385 P3d 1178 (2016) (dismissing a direct criminal appeal as moot after the judgment on appeal was vacated in a post-conviction proceeding); *see also DeWolf v. Mt. Hood Ski Bowl, LLC*, 284 Or App 435, 453, 392 P3d 759, *rev den*, 361 Or 885 (2017) (affirming a new-trial order and, consequently, declining to address assignments of error to evidentiary and instructional rulings made at trial). Accordingly, we do not address defendant's assignments of error based on the general judgment. For the same reason, we do not consider defendant's assignments of error to the court's denial of its motion to reduce the verdict: In light of the court's entry of the new-trial order, there is presently no verdict to be reduced.

We address in the text the separate question of whether defendant's assignments of error based on the new-trial order are reviewable. 306 Or App at 223-25.

we provide additional facts as they become necessary for our analysis of other issues.

At trial, the parties agreed that Golik died from mesothelioma caused by exposure to asbestos. Plaintiff presented evidence that Golik had worked as an insulator helper at defendant's mill for a few weeks during 1965. Golik was not directly employed by the mill; rather, he was an employee of Armstrong Contracting and Supply Corporation (AC&S), which applied asbestos insulation at the mill during that time. Plaintiff's expert, Dr. Brodkin, testified that Golik's work as an insulator helper at the mill would have exposed him to "very intense levels" of airborne asbestos fibers for the duration of his work at the mill and that the type of insulation that he was applying—insulation for high-temperature applications—would involve exposure to amphibole fibers, which are "the most dangerous" type of asbestos.

Plaintiff presented evidence that defendant knew or should have known that the insulating work that AC&S and its workers did would necessarily create large amounts of airborne asbestos on defendant's premises and knew or should have known that asbestos was dangerous to human health, but that it did nothing to protect Golik from the danger. Brodkin opined that, because mesothelioma is a dose-response disease—the risk of developing it increases with each increment of exposure to asbestos—Golik's exposure to asbestos at defendant's mill was a substantial contributing factor in causing his death.

The court determined that Washington law governed plaintiff's claims. As relevant here, plaintiff alleged two claims: First, she alleged that, pursuant to the *Restatement (Second) of Torts* sections 343 and 343A, which Washington courts have adopted, defendant owed Golik a duty of care as a landowner, because Golik was a business invitee on its premises. Second, she alleged a negligence claim. On that claim, she raised alternative theories as to defendant's duty to Golik: First, she contended that defendant owed Golik a duty of care because it retained control over the work he performed, even though he was an employee of AC&S rather than an employee of defendant. Second, plaintiff contended

that defendant owed Golik a statutory duty of care under *former* RCW 49.16.030 (1967), *repealed by* 1973 Wash Laws, ch 80, § 28, which, she argued, required an employer to provide a safe place of work for anyone, including independent contractors, who worked on the employer's premises.

Before the jury, defendant argued against liability in several ways. First, it questioned the evidence that Golik had actually worked at the mill. Second, it contended that it owed no duty to Golik because he was not its employee and, it argued, it had not retained sufficient control over his work or the work of AC&S to justify imposition of liability on any of plaintiff's legal theories. Third, it contended that any exposure at its mill was not a substantial contributing factor in causing Golik's illness because it was insignificant compared to Golik's other exposures to asbestos throughout his 20-year career.

That third strategy—a focus on Golik's other exposures to asbestos throughout his career—is the relevant one for our review of the new-trial order. Because Golik died before the litigation began, defendant could not question him about his exposures to asbestos. To show other exposures, defendant introduced Golik's medical records, in which he had reported, without much detail, exposure to asbestos from installing insulation; from his work in the military; while he was working in shipyards, both as an electrician and while he worked dismantling ships; and while he was in the merchant marine. It also introduced his social security records, which showed his employers over the course of his career but did not identify any exposure to asbestos. Finally, over plaintiff's vigorous objections, it introduced official records of Golik's work in the merchant marine.[3] Those records stated the name of each ship that Golik worked on, the dates of his employment, and his job title; they did not document any exposure to asbestos.

Golik's other exposures to asbestos were explained in more detail in documents that he and plaintiff had

---

[3] Plaintiff argued that defendant had not presented any evidence about what work Golik actually did in the merchant marine that would allow the jury to infer from the information in the records that he had been exposed to asbestos or that any exposure had increased his risk of mesothelioma.

submitted in support of numerous claims they made to various asbestos bankruptcy trusts. To make a claim to an asbestos bankruptcy trust, the claimant generally submits a trust-specific claim form and also submits documentation of the facts supporting the claim. The supporting documents often contain more detailed information than the claim form alone.

During discovery, one of the defendants requested the claim forms, supporting documents, and any information that Golik and plaintiff had submitted to the bankruptcy trusts. Plaintiff produced the claim forms that were submitted to the trusts. She also produced what the parties referred to as the comprehensive work-history affidavit, which had been submitted to some of the trusts in support of the claims. In that work-history affidavit, Golik summarized his asbestos-related work history and detailed several of his exposures to asbestos. In the work-history affidavit, in addition to attesting to many other exposures, Golik stated that he had worked, and been exposed to asbestos, on various defendants' premises, including at defendant's mill.

Regarding Golik's work in the merchant marine, the work-history affidavit stated the following:

"8.   I was a Merchant Marine from 1968 to 1969. I worked as a wiper in the engine room of three ships. I was aboard the Santa Victoria for 9 months, the SS Philippine Bear for 5 months, and I was aboard a WWII-era ship which transported ammunition from San Francisco to Vietnam for 4 months.

"9.   During my career as a Merchant Marine I worked on ships and in various shipyards as part of my duties. I worked at, but not limited to, the following shipyards each for a period of more than one month: Alameda Naval Shipyard, Alameda, CA and Mare Island Naval Shipyard (Hunter's Point), San Francisco, CA.

"*****

"13.   During my total working career as an Insulator Helper, Marine Electrician Helper, Merchant Marine and

> Welder I installed, altered, repaired or otherwise worked with, but not limited to the asbestos-containing products described in Paragraphs 4 [(regarding his work as an insulator helper)], 6 [(regarding his work as a marine electrician helper)], 10 [(regarding his work as a welder in Vancouver, Washington)], and 12 [(more regarding his work as a welder in Vancouver, Washington)] above for a substantial part of the workday for a total of at least five years altogether."

Thus, the work-history affidavit is ambiguous with respect to Golik's work aboard ships in the merchant marine. He states that he worked as an engine room wiper aboard three ships and includes his work in the merchant marine in paragraph 13, which provides a broad description of his exposure to asbestos. However, the affidavit provides no specific information about exposure to asbestos during his time aboard ships. Instead, the affidavit suggests an inference that he was exposed to asbestos in the merchant marine while he worked "on ships at various shipyards."

Numerous discussions on the record before and during trial demonstrate that information about Golik's other exposures to asbestos was of great interest to all parties. The most detailed information about Golik's other exposures that defendant had was in the work-history affidavit, and defendant wanted to use it as evidence of those other exposures. For her part, plaintiff very strongly desired to use the work-history affidavit as evidence that Golik worked at defendant's premises and was exposed to asbestos there. Plaintiff could not introduce the affidavit because, as to her, it was hearsay.

As to defendant, the affidavit was not hearsay, because it was a statement of a party opponent. OEC 801 (4)(b)(A). However, defendant ardently desired to avoid having plaintiff use the affidavit as evidence that Golik was exposed on its premises. The court indicated that, if defendant introduced the affidavit to use parts of it as evidence of Golik's other exposures, then plaintiff would be allowed to use the rest of the affidavit as evidence of Golik's exposure at defendant's premises.

Because of the likelihood that plaintiff would be able to use the affidavit to show exposure on defendant's

premises, defendant did not introduce the work-history affidavit.[4] However, the absence of detailed information about Golik's other exposures to asbestos hampered its efforts to argue that Golik's other exposures rendered any exposure at its mill insignificant.

In the absence of the work-history affidavit, the evidence that was available lacked the level of detail necessary for defendant to show that much of Golik's other work—in particular, his work aboard ships in the merchant marine—exposed him to asbestos in any significant way. In response to cross-examination questions from Longview Fibre's counsel, plaintiff's expert, Brodkin, testified that Golik's "sporadic" work in shipyards for six months was an identified exposure that would have been a substantial factor in causing his mesothelioma. The same was true regarding three months of work that Golik did on ships in shipyards—not aboard ships at sea—while he was in the merchant marine. However, with respect to Golik's exposure while he was aboard ships at sea in the merchant marine as a wiper, plaintiff's expert, Brodkin, testified that Golik's "work as a wiper *per se* was not a[n] identified exposure. Again, these are merchant marines operating a vessel. He wouldn't have disrupted insulation during operations of a vessel." Defendant had no contradictory information.

Likewise, the testimony of defendant's expert, Robert Adams, about Golik's alternative exposures was limited by a lack of detail about those other exposures. Regarding Golik's potential exposure as a welder helper and later a welder at shipyards in the 1960s, Adams testified that he could have had some exposure, but the exposure level varied dramatically "depending on the type of work and where the work was being conducted," which was information that he did not have. Adams reiterated the uncertainty when he was asked to opine on whether that exposure increased Golik's risk of mesothelioma: "The difficulty

_____

[4] Longview Fibre briefly elicited some of the alternative exposure information from the affidavit on cross-examination of plaintiff's expert, Brodkin. After other defendants objected based on the court's previous rulings and the risk of plaintiff arguing that the defense had opened the door to the whole affidavit— and after plaintiff's counsel stated his intention to "go charging through the door" on redirect—none of the defendants pursued that strategy further.

in this case is that, based on the information that I have, it's hard to know exactly whether those exposure levels were high enough to represent an increased risk."

The jury was not persuaded by any of defendant's arguments, and it returned a verdict for plaintiff on both of her claims. On the negligence claim, the jury accepted both of plaintiff's theories as to why defendant owed Golik a duty of care.

After trial, defendant requested a hearing at which the court would decide whether plaintiff's previous settlements with the bankruptcy trusts had been reasonable. Under Washington law, once the court made that determination, it would reduce the verdict by the amount of the previous settlements.

To prepare for that hearing, defendant sought additional information about those settlements, and it ultimately asked the court to order plaintiff to allow it to request documents directly from the bankruptcy trusts. The court agreed.

When defendant received the documents from the bankruptcy trusts, it discovered that, during pretrial discovery, plaintiff had not turned over to defendant all the documents describing Golik's other exposures to asbestos that had been submitted to the trusts. Among the undisclosed documents was an affidavit in which Golik described his work in the merchant marine. In that affidavit, which we refer to as the merchant marine affidavit, Golik first repeated the description of his work as a wiper that appeared in the work-history affidavit:

> "I was a U.S. Merchant Marine from 1968 to 1969. During this time period, I worked as a wiper in the engine room of three ships. I was aboard the Santa Victoria for 9 months, the SS Philippine Bear for 5 months, and I was aboard a WWII-era ship which transported ammunition from San Francisco to Vietnam for 4 months."

Then, unlike in the work-history affidavit, he proceeded to describe in detail his exposure to asbestos as a wiper aboard the Philippine Bear:

"As a wiper aboard the SS Philippine Bear, my duties included, but were not limited to, cleaning, operating, repairing and maintaining engines, boilers, generators, pumps, pipes, gaskets, and turbines. I was regularly exposed on a daily basis to asbestos and asbestos-containing materials including, but not limited to pipe insulation, boilers, pumps, gaskets, generators, and other refractory products and breathed air containing particles of dust arising from such materials."

Moreover, unlike the work-history affidavit, the merchant marine affidavit did not mention any of the defendants' premises.[5]

After defendant received the documents, it moved for a new trial under ORCP 64 B(2) and (4). As relevant here, it argued that plaintiff's failure to turn over the documents, including the merchant marine affidavit, was misconduct by the prevailing party, under ORCP 64 B(2), that materially affected defendant's substantial rights. As explained in detail below, the court ultimately agreed. Based on that ruling and the court's additional conclusion that the newly discovered evidence justified a new trial under ORCP 64 B(4), the court ordered a new trial and vacated the general judgment.

Plaintiff appeals. Because it is dispositive, we consider only the correctness of the court's ruling under ORCP 64 B(2). That rule provides as follows:

"A former judgment may be set aside and a new trial granted in an action where there has been a trial by jury on the motion of the party aggrieved for any of the following causes materially affecting the substantial rights of such party:

"* * * * *

"B(2)   Misconduct of the jury or prevailing party."

Plaintiff contends that "misconduct," as used in that provision, requires "something more than mere inadvertence

---

[5] The newly obtained documents also included several other affidavits that contained, essentially, other excerpts from the work-history affidavit. All the other affidavits did mention exposure on defendant's premises. Before the trial court, defendant argued that those affidavits and other newly obtained documents also justified a new trial. The trial court rejected those arguments, and we do not consider them.

or simple error." She argues that, here, the trial court found that the failure to produce the merchant marine affidavit and other documents was mere inadvertence or simple error and, thus, the court erred in concluding that she had engaged in misconduct. Alternatively, she suggests that, even if the trial court found that the failure to produce the documents was more than mere inadvertence or simple error, it erred because it had to apply a presumption of misconduct to reach that determination. Finally, she argues that, even if there was misconduct, it did not "materially affect[] the substantial rights of" defendant. ORCP 64 B.

"The trial court is the finder of fact at a hearing on a motion for a new trial." *DeWolf v. Mt. Hood Ski Bowl, LLC*, 284 Or App 435, 447, 392 P3d 759, *rev den*, 361 Or 885 (2017) (internal quotation marks omitted). Accordingly, we defer to the court's explicit and implicit findings of fact if they are supported by evidence in the record. *Id.*

"When the trial court's order of a new trial is based on an interpretation of the law, we review that order for errors of law. If the trial court made no predicate legal error, then we review its decision for an abuse of discretion." *Id.* (internal quotation marks and citation omitted). "With regard to whether the ground for a new trial involved conduct or evidence that materially affected the moving party's substantial rights, we will usually defer to a trial court's determinations of prejudicial effect, reviewing for an abuse of discretion." *Id.*; *cf. Gragg v. Hutchinson*, 217 Or App 342, 347, 176 P3d 407 (2007), *rev den*, 344 Or 401 (2008) ("Because the trial court is usually in a better position to evaluate the circumstances of each case and the prejudicial effect, if any, of any claimed irregularity, we defer to the trial court's conclusions regarding prejudice." (Internal quotation marks omitted.)).[6]

---

[6] In light of the Supreme Court's explanation that "discretion" refers to "the authority of a trial court to choose among several legally correct outcomes," *State v. Rogers*, 330 Or 282, 312, 4 P3d 1261 (2000), our standard of review of the court's determination of prejudicial effect of misconduct has three parts: First, we review the trial court's implicit and explicit factual findings for any evidence. *DeWolf*, 284 Or App at 447. Second, we review for legal error the court's interpretation and application of the statutory text, that is, whether the misconduct identified by the court qualifies as misconduct "materially affecting the substantial rights" of the party. ORCP 64 B; *see also, e.g.*, *DeWolf*, 284 Or App at 447 (we

We begin by considering whether the trial court erred in determining that the failure to produce the documents supporting the bankruptcy trust claims was "misconduct." ORCP 64 B(2). As noted above, plaintiff first argues that the court found that her failure to produce the merchant marine affidavit was inadvertent. She contends that inadvertent failure to produce a document cannot be misconduct.

To evaluate that argument, we must consider the court's ruling and its factual findings. As we will explain, we disagree with plaintiff's first premise: In our view, the court found that plaintiff's local counsel deliberately, rather than inadvertently, failed to produce the merchant marine affidavit.

To explain that conclusion, we recount the proceedings below at some length. As noted above, in the new-trial motion, defendant argued that plaintiff's failure to turn over the documents, including the merchant marine affidavit, was misconduct by the prevailing party that materially affected defendant's substantial rights. In its written argument, defendant contended that a failure to produce discovery was misconduct within the meaning of ORCP 64 B(2) regardless of whether it was done accidentally or intentionally.

Plaintiff conceded that the documents were responsive to discovery requests and should have been produced. Plaintiff's lead counsel, who were from an out-of-state law firm, asserted that the failure to produce the documents was a mistake based on a miscommunication between the out-of-state firm and plaintiff's local counsel:

---

review interpretation and application of the law for errors of law). Finally, "[o]nly if we determine that application of the correct legal principles leads to more than one correct outcome do we continue to review whether the trial court abused its discretion in choosing an outcome." *Rogers*, 330 Or at 312; *see also Gross v. Hacker*, 168 Or App 529, 531 n 1, 4 P3d 1281 (2000), *rev den*, 332 Or 239 (2001) (noting that the court's explanation of the concept of discretion in *Rogers* applies to our review of decisions based on ORCP 64 B).

Here, plaintiff's challenges address only the first and second of those steps— she disagrees that the outcome that the court reached was legally correct rather than challenging any choice by the court between two legally correct alternatives. Accordingly, we do not address the third issue.

> "Plaintiff does not dispute, and has never disputed, that these additional supporting documents are responsive to various requests for production and should have been produced. But due to a miscommunication between Plaintiff's law firms—Waters & Kraus [plaintiff's lead counsel] and the Law Office of Jeffrey S. Mutnick [plaintiff's local counsel]—they regrettably were not provided to counsel preparing the discovery responses. It was not until the trusts started sending documents directly [to defendant, after trial,] that Waters & Kraus first became aware some documentation had not been produced during discovery. Had Waters & Kraus been in possession of these documents previously, it would have produced them."

Plaintiff contended that an innocent failure to provide discovery was not misconduct.

At the hearing, the court focused on the meaning of "misconduct" in ORCP 64 B(2). Plaintiff's lead counsel described in more detail how the failure to produce the documents came about:

> "When we got the discovery request asking for the bankruptcy documents, we sent an e-mail to Mr. Mutnick's office saying we have this discovery request, please send us all the claim forms. Their office read the request very literally to be just the claim forms, not any of the supporting documentation that had been submitted along with the claim forms. We didn't know the other supporting documentation existed. They sent us the claim forms, we thought that was it and we voluntarily produced them in response to the discovery [request]. That's really what happened."

In response, defense counsel noted that plaintiff's explanation of the failure to produce the documents was not complete:

> "Even if you wanted to read the discovery request that [plaintiff's lead counsel] noted literally [as including only the claim forms, not any supporting documents], we submitted multiple other discovery requests that asked for any supporting documentation that was submitted to the trust[s] in addition to the claim forms.
>
> "I don't know if those requests were sent to Mr. Mutnick. I don't know why Mr. Mutnick would not have submitted the supporting documentation to plaintiff's counsel."

The defense also argued that, in the absence of any information from plaintiff's local counsel, the court should infer that local counsel's failure to produce the documents was not inadvertent:

"I think it's very telling that Mr. Mutnick did not show up today. He did not show up a few months ago when we were here and this issue came up. There's not an affidavit from Mr. Mutnick that explains this. There's no documents that have been submitted that would explain how this innocent mistake happened."

Later in the hearing, defense counsel summarized what he understood to be the court's position, which aligned with defendants' view that the failure to produce the documents was not inadvertent: "the silence [from local counsel] is deafening."

The court expressly credited plaintiff's lead counsel's explanation of their firm's role in the failure to provide discovery. The court held that that innocent mistake by lead counsel was not misconduct and, thus, held that lead counsel had not engaged in misconduct. However, as explained below, the court found that plaintiff's local counsel had deliberately withheld discovery.

During his argument, plaintiff's counsel argued that something more than inadvertence was required before the court could find misconduct and, implicitly, that direct evidence from plaintiff's local counsel was necessary to prove it:

"The time for them to submit evidence for the motions is closed a while ago and they have not submitted any evidence of—of misconduct. The Court recognized that, and as we explained in our brief, there has to be something more than a failure to just do something you're supposed to do. That's to use—to use their terms. Some evidence of negligence, malfeasance, misfeasance, even if it's not intentional misconduct, there has to be some additional if you want to call it *mens rea*, a scienter or what have you, it has to be something more. The very term of 'misconduct' itself implies that."

The court accepted plaintiff's view of the meaning of misconduct, but disagreed that direct evidence was necessary

to prove local counsel's reason for withholding discovery. Instead, the court inferred from the record that local counsel's failure to provide discovery was not inadvertent. The court responded:

> "So the evidence I have before me is defendants made the specific request for all documents associated with submitting claims to all of the bankruptcy trusts and settlement trusts. They received some of the documents, but they didn't receive one particular—and the one that concerns me the most is an affidavit by the decedent himself talking about very significant asbestos exposure in locations other than defendants' locations [that is, the merchant marine affidavit]. So that—I mean, doesn't the fact that some of the documents were—or couldn't one reasonably infer from that, absent an innocent explanation, that there was misconduct?
>
> "[PLAINTIFF'S OUT-OF-STATE COUNSEL]:   No.
>
> "THE COURT:   That it was picking and choosing and Mutnick chose not to turn it over?"

The court did not explicitly state its factual findings. However, we are persuaded that the court ultimately answered the question it had posed in the affirmative, deciding that, given the information it had, it could, and would, infer that local counsel "chose not to turn it over," that is, deliberately chose not to provide the merchant marine affidavit.

In closing, the court contrasted the innocent mistake by plaintiff's lead counsel, which it concluded was not misconduct, with local counsel's failure to turn over the discovery:

> "* * * I have no explanation for why discovery was held by Mr. Mutnick. And again, this is no disparagement of the [out-of-state] attorneys who came to trial and have done their best to remedy the situation, but an affidavit from the decedent that doesn't mention the other defendants or the premises-owner defendants in the affidavit that gives detail or significant detail about significant exposures to amphibole asbestos, that did—was material and did affect the substantial rights of the parties. And I can only construe, based on the evidence I have, that there was—it

was a discovery violation and that it rises to the level of misconduct."

After stating both of its rulings (under ORCP 64 B(2) and ORCP 64 B(4)), the court noted that there was no time to write an opinion on the issue, because the deadline for deciding the new-trial motion was too soon. The court stated that it was adopting the reasoning from defendant's brief. As noted above, in the briefing, defendant had argued that even accidental failure to provide discovery was misconduct under ORCP 64 B(2). However, even if the court intended to adopt that theory, we conclude from the court's much more specific remarks earlier in the hearing that it also found that local counsel deliberately withheld the merchant marine affidavit. As set out above, in making its ruling, the court noted local counsel's failure to turn over the documents to plaintiff's lead counsel and then went to great lengths to make clear that it was not finding misconduct on the part of plaintiff's lead counsel. It then found that there had been a discovery violation and "that it rises to the level of misconduct." That is, misconduct requires more than a discovery violation, and the situation here involved more than a discovery violation.

Thus, the trial court found that local counsel deliberately withheld discovery that he knew was responsive to defendant's requests for production. Accordingly, we reject plaintiff's contention that the court found that the discovery violation was the result of an innocent mistake.

Plaintiff does not dispute that deliberate withholding of materials responsive to a request for production is misconduct for purposes of ORCP 64 B(2). *Cf. DeWolf*, 284 Or App at 452 (holding that a party engaged in misconduct by failing to provide discovery pursuant to a court order based on an unreasonable interpretation of the document at issue). Thus, it remains only for us to address plaintiff's suggestion that the court improperly applied a presumption of misconduct. As we understand that argument, plaintiff contends that defendant could not meet its burden of proving that misconduct had taken place in the absence of an explanation from plaintiff's local counsel about why he did not produce the documents during discovery. We disagree.

As the court recited, the facts before it showed that, despite several clear discovery requests that required disclosure of all of the documents and information submitted to the bankruptcy trusts, plaintiff's local counsel failed to produce some documents that were submitted to the trusts, including the merchant marine affidavit, which was a significant and valuable piece of evidence for the defense. Then, although it should have been clear that local counsel's reason for failing to produce the documents was important, local counsel did not appear or otherwise make any effort to explain his actions.

In finding that local counsel's failure to produce the documents was deliberate, the court did not apply a presumption; rather, it made an inference from the facts. The court could infer from the circumstances—the facts about the requests for production, out-of-state counsel's request for the documents, and the significance of one of the omitted items— that local counsel would have known that they needed to be produced, but nevertheless did not produce them.[7] Further, it could infer from his absence and the absence of an affidavit from him that he was unwilling to defend his failure to produce the documents. *Cf. Cler v. Providence Health System*, 349 Or 481, 489, 245 P3d 642 (2010) ("In general terms, [the missing witness] inference provides that, '[w]hen it would be natural under the circumstances for a party to call a particular witness *** and the party fails to do so, tradition has allowed the adversary to use this failure as the basis for invoking an adverse inference.' 2 *McCormick on Evidence* § 264, at 220 (6th ed. 2006).").

It is true that, as plaintiff argues, there could be other explanations for local counsel's failure to produce the documents. However, in this instance, deciding which inference to make from the facts was within the province of the factfinder—the trial court—and we cannot disturb the court's findings on appeal. *DeWolf*, 284 Or App at 447. In sum, the court found that local counsel deliberately withheld discovery, and the record supports that finding. Thus, the court did not err in determining that there was misconduct.

---

[7] It is undisputed that plaintiff's local counsel knew of the existence of the supporting documents, as he submitted bankruptcy trust claims on behalf of Golik and plaintiff.

Next, we consider whether the misconduct materially affected defendant's substantial rights. In the briefing, plaintiff addresses prejudice under ORCP 64 B(2)—allowing for a new trial based on misconduct "materially affecting the substantial rights" of the moving party—only as part of her argument that the documents do not merit a new trial on the ground of newly discovered evidence under ORCP 64 B(4). However, the two standards are different. To order a new trial under ORCP 64 B(4), a court must determine, among other things, that the newly discovered evidence "will probably change the result if a new trial is granted." *State v. Arnold*, 320 Or 111, 120, 879 P2d 1272 (1994). The standard under ORCP 64 B(2), however, is less demanding. ORCP 64 B(2) requires only that the misconduct "materially affect[] the substantial rights of" the moving party, and neither we nor the Supreme Court have suggested that any greater showing than that must be made. *See, e.g.*, *DeWolf*, 284 Or App at 453 (holding that a discovery violation materially affected the plaintiff's rights because it deprived the plaintiff of the ability to fully rebut the defendant's argument at trial).

As described above, one of defendant's central trial strategies was to argue that any exposure to asbestos that Golik had at its mill was insignificant compared to his other exposures to asbestos over the course of his career. As noted above, the evidence that plaintiff presented indicated that Golik had been exposed to asbestos on defendant's premises for less than one month. Defendant wanted to show that Golik had had other exposures lasting much longer and, thus, that the exposures at defendant's mill was insignificant by comparison. The vehemence of plaintiff's objections to defendant's attempts to provide the jury with information about other exposures shows that, at least in plaintiff's view, that strategy had some merit.

As explained above, however, that strategy was hampered by the lack of detailed evidence about Golik's other exposures. Although defendant had some information about other exposures in the form of the comprehensive work-history affidavit, it did not offer that affidavit because it cut against its theory that Golik did not work at its mill, and plaintiff intended to emphasize that aspect of

the affidavit if it came in. Longview Fibre's attempt to have the same information admitted through cross-examination of plaintiff's expert was limited because of concerns about the potential for opening the door to the rest of the affidavit. Defendant introduced Golik's medical records and merchant marine records, but those records did not provide the kind of detail necessary for an expert to opine that the other exposures were significant enough that they would have been a cause of Golik's mesothelioma.

In particular, the materials that defendant had at trial provided no detailed information about Golik's exposure while he was a wiper aboard ships in the merchant marine. As set out above, the work-history affidavit indicated that some part of Golik's work the merchant marine involved exposure to asbestos, but it did not identify any particular products or activities that would have exposed Golik to asbestos while he was working as a wiper aboard ships at sea; instead, it suggested that his exposure was limited to the time when he worked on ships in shipyards. The same was true of Golik's medical records. Consistently with that documentation, plaintiff's expert testified at trial that Golik's work as a wiper aboard ships at sea would not have exposed him to asbestos: His "work as a wiper *per se* was not a[n] identified exposure. Again, these are merchant marines operating a vessel. He wouldn't have disrupted insulation during operations of a vessel."

But one of the documents that was withheld, the merchant marine affidavit, did include detailed information about one of Golik's other exposures to asbestos. It contained Golik's testimony that he was exposed to asbestos on a daily basis while he was working as a wiper aboard ships in the merchant marine:

> "As a wiper aboard the SS Philippine Bear, my duties included, but were not limited to, cleaning, operating, repairing and maintaining engines, boilers, generators, pumps, pipes, gaskets, and turbines. I was regularly exposed on a daily basis to asbestos and asbestos-containing materials including, but not limited to pipe insulation, boilers, pumps, gaskets, generators, and other refractory products and breathed air containing particles of dust arising from such materials."

The trial court determined, and we agree, that, from that description of Golik's work on the Philippine Bear, the jury would have been able to infer that Golik's exposures on the Philippine Bear were to amphibole asbestos and that he had similar exposures on the other two ships on which he was a wiper. Thus, if that affidavit had come into evidence, the jury could have inferred that Golik was exposed to the most dangerous kind of asbestos on a daily basis for a total of 18 months—more than 18 times as long as the exposures at defendant's mill, and twice as long as his two other identified exposures combined—while he worked as a wiper aboard ships in the merchant marine.

As the trial court also noted, that affidavit did not mention defendant's premises, which strengthens the inference that defendant would have chosen to introduce it into evidence; it would not have undermined defendant's denial that Golik had been exposed on its premises. Plaintiff contends that that is immaterial because "the use of [the merchant marine affidavit] at trial would have opened the door to myriad documents placing Mr. Golik at defendants' mills, which is the very thing they fought so hard to avoid."

Plaintiff contended before the trial court, and appears to contend again on appeal, that admission of any of the records from the bankruptcy trust claims would necessarily have "opened the door" to admission of all of those records. Before the trial court, plaintiff suggested that OEC 106, the rule of completeness, would require that, if any of the trust documents were admitted, all of them would have to be received in evidence.[8] However, they do not renew that contention on appeal, nor do they cite any other rule or principle that would require admission of other trust documents if the merchant marine affidavit were introduced. In the absence of substantive argument on that point, we do not

---

[8] OEC 106 provides as follows:

"When part of an act, declaration, conversation or writing is given in evidence by one party, the whole on the same subject, where otherwise admissible, may at that time be inquired into by the other; when a letter is read, the answer may at that time be given; and when a detached act, declaration, conversation or writing is given in evidence, any other act, declaration, conversation or writing which is necessary to make it understood may at that time also be given in evidence."

perceive any error in the trial court's determination that defendant could have introduced the merchant marine affidavit, which does not refer to any bankruptcy trust claims or to defendant's premises, without opening the door to other bankruptcy trust records that did mention defendant's premises.

Considering the context of the whole case—defendant's strategic choices, the evidence that was available at trial, the significance of the merchant marine affidavit, and the likelihood that the jury would have been persuaded—the trial court found that the absence of the merchant marine affidavit was important and, consequently, held that the misconduct materially affected defendant's substantial rights. We agree that the misconduct materially affected defendant's substantial rights; it materially impaired defendant's ability to present its case to the jury.

There is some likelihood that the outcome would have been different if defendant had been able to present the merchant marine affidavit. Accordingly, the trial court did not err in ordering a new trial under ORCP 64 B(2) and vacating the judgment.

## DEFENDANT'S CROSS-APPEAL

We turn to defendant's challenges to the court's denial of its JNOV motion, beginning by considering the reviewability of those assignments of error. Our review of the denial of a JNOV motion based on the insufficiency of the evidence is circumscribed in several ways. First, orders that deny both new trial and JNOV motions are not appealable. *Building Structures, Inc. v. Young*, 328 Or 100, 111, 968 P2d 1287 (1998) (order denying JNOV is not appealable); *Iron Horse Engineering v. Northwest Rubber*, 193 Or App 402, 415, 89 P3d 1249 (2004) (order denying new trial and JNOV is not "reviewable"). However, when the court grants a motion for a new trial and denies a JNOV motion in the same order, that order is appealable and the denial of the JNOV motion is, as a general matter, reviewable. *See* ORS 19.420(2) ("Where in the trial court a motion for judgment notwithstanding the verdict and a motion for a new trial were made in the alternative, and an appeal is taken from

a judgment notwithstanding the verdict or an order granting a new trial, the court to which the appeal is made may consider the correctness of the ruling of the trial court on either or both motions if such ruling is assigned as erroneous in the brief of any party affected by the appeal, without the necessity of a cross-appeal."); *see also Hillman v. North. Wasco Co. PUD*, 213 Or 264, 301, 323 P2d 664 (1958), *overruled on other grounds by Maulding v. Clackamas County*, 278 Or 359, 563 P2d 731 (1977) (under a previous, similar version of the statute, "when an appeal is taken from an order granting a new trial the right to cross-appeal from an adverse decision on a motion for [JNOV] is also granted by implication and \*\*\* we are authorized to consider the merits of that motion").

Despite that general principle allowing review of the denial of JNOV motions when a new trial has been granted, other limitations still apply. We may review the denial of a JNOV motion only if the party assigning it as error raised the same issue in a motion for directed verdict at the close of all of the evidence, as required by ORCP 63 A. *Building Structures, Inc.*, 328 Or at 111 (a directed verdict motion made at the close of all of the evidence "is the necessary predicate for entry of a judgment notwithstanding the verdict under ORCP 63"). That limitation results in a further narrowing of the circumstances under which we review the denial of a JNOV motion because, if the party has made a motion for directed verdict—as it is required to as a prerequisite to obtaining review of the denial of the JNOV motion— "the better practice is to eschew the circuitous approach and to state the basic issue directly by assigning as error the denial of the motion for a directed verdict." *Clarizo v. Spada Distribution Co.*, 231 Or 516, 520, 373 P2d 689 (1962); *see also, e.g.*, *Najjar v. Safeway Inc.*, 203 Or App 486, 489, 125 P3d 807 (2005) (noting that we did not need to consider the denial of a JNOV motion because "[d]efendants' arguments on their assignment of error to the denial of their motion for judgment notwithstanding the verdict are subsumed within their assignment of error on the denial of their motion for a directed verdict"). *But see Brown v. Washington County*, 163 Or App 362, 375, 987 P2d 1254 (1999), *rev den*, 331 Or 191 (2000) (evaluating the merits of both the defendant's

directed verdict motion and its JNOV motion and concluding that the court correctly denied both of them for the same reasons).

      The present case is one of the few cases in which all of the requirements for review of the denial of a JNOV motion are met and in which we cannot review the denial of the preceding directed-verdict motion rather than the denial of the JNOV motion: The new trial order is appealable because the court granted a new trial as well as denying defendant's JNOV motion. The issues raised in defendant's JNOV motion were properly raised in a motion for directed verdict made at the close of all the evidence, as required by ORCP 63 A. Finally, as explained above, 306 Or App at 204 n 2, defendant's assignments of error based on the general judgment—including its assignments of error to the denial of its motion for directed verdict—are moot because the general judgment properly has been vacated.[9] Thus, defendant's assignment of error to the denial of the JNOV motion is reviewable, and we must consider the merits of defendant's arguments.

      On the rare occasion when we review the denial of a JNOV motion, we apply the same standard of review that we apply when the court has granted a JNOV:

> "[W]e view the evidence in the light most favorable to the party who prevailed before the jury—here, plaintiff—and examine the record to ascertain whether it contains evidence which supports the verdict. Our review of the record is circumscribed by the case actually presented to the jury through pleadings, evidence, and jury instructions. We must [not disturb] the jury verdict unless we can say affirmatively that there was no evidence to support it."

_____

[9] By contrast, the assignment of error to the denial of the JNOV motion is not moot because, if it is correct, it entitles defendant to more complete relief than the new trial to which the trial court determined that defendant was entitled. In other words, if we were to conclude that the trial court erred in denying the JNOV motion on either of plaintiff's claims, we would remand for entry of a judgment in defendant's favor on the claim or claims on which it was entitled to judgment notwithstanding the verdict. *See Hillman*, 213 Or at 301 (noting that the court would review the denial of the defendant's JNOV motion in a case where the trial court had granted a new trial and denied the defendant's JNOV motion because the "defendant could not appeal from the judgment for the plaintiff because it was set aside" and the defendant would have been entitled to more complete relief—a final judgment, not just a new trial—if the JNOV had been granted).

*Vukanovich v. Kine*, 268 Or App 623, 633, 342 P3d 1075, *adh'd to as modified on recons*, 271 Or App 133, 349 P3d 567 (2015) (internal quotation marks, brackets, and citations omitted); *see Hillman*, 213 Or at 310-15 (reviewing denial of JNOV motion for legal error and sufficiency of the evidence).

Defendant contends that the trial court erred in failing to enter judgment notwithstanding the verdict on each of plaintiff's claims. Its arguments on each claim go to whether it owed a duty to Golik, rather than any other element of the claims. We begin with defendant's challenge to plaintiff's premises liability claim.

In the premises liability claim, plaintiff alleged that defendant owed Golik a duty of care as a landowner because Golik was a business invitee on its premises. Defendant contended that the cause of Golik's injury was outside the scope of its duty to him because plaintiff did not show that there was a dangerous condition on defendant's premises; defendant argued that its premises was not in a dangerous condition when it was turned over to Golik's employer, AC&S, because it is undisputed that AC&S's work—and not any work done directly by defendant's employees—created the airborne asbestos that injured Golik.

Plaintiff responded that defendant created a dangerous condition on the premises by directing AC&S to install asbestos insulation on its boiler because that installation necessarily created the airborne asbestos that caused Golik's mesothelioma. In denying defendant's motions for directed verdict and JNOV, the trial court agreed with plaintiff that her premises liability theory turned on defendant's own negligence, not negligence of AC&S, and that Washington law did not insulate defendant from liability for its own negligence.

"Employees of independent contractors hired by landowners are invitees on the landowners' premises." *Kamla v. Space Needle Corp.*, 147 Wash 2d 114, 125, 52 P3d 472, 477 (2002). The Washington Supreme Court has adopted the *Restatement (Second) of Torts*, sections 343 and 343A (1965), to govern landowners' duties to invitees. Those sections provide as follows:

"A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger."

*Restatement* § 343.

"'A possessor of land is not liable to his [or her] invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.'"

*Iwai v. State, Employment Sec. Dept.*, 129 Wash 2d 84, 94, 915 P2d 1089, 1093 (1996) (quoting *Restatement* § 343A).

As relevant here, together, those two sections impose liability to invitees for injuries from activities or conditions on the land whose danger is known or obvious to the invitees when, despite the fact that the danger is known or obvious, the possessor should anticipate the harm.[10] *See, e.g.*, *Kamla*, 147 Wash 2d at 126, 52 P3d at 478 ("Properly framed, the question in this case is whether Space Needle should have anticipated Kamla's harm, despite the obvious hazard posed by the moving elevators."); *Iwai*, 129 Wash 2d at 94, 915 P2d at 1093 ("Mrs. Iwai may have known about the ice in the parking lot, but if Employment Security 'c[ould] and should [have] anticipate[d] that the dangerous condition w[ould] cause physical harm to the invitee notwithstanding its known or obvious danger,' then section 343A may impose liability." (Quoting *Restatement* section 343A.)).

Defendant does not challenge the sufficiency of the evidence to impose liability under those sections. Rather, as noted above, it contends that, as a matter of law, AC&S's creation of airborne asbestos was not properly considered an

---

[10] Here, the parties disputed the degree to which the danger from the airborne asbestos was known to Golik or obvious. For purposes of our analysis, we assume that the danger was known or obvious.

activity or condition on defendant's land because AC&S, not defendant, brought the asbestos onto the land.

In support of that position, it relies on Washington case law holding that, generally, a premises owner is not liable for injuries to the employees of a subcontractor as long as the premises were safe when they were turned over to the subcontractor. *See, e.g.*, *Epperly v. City of Seattle*, 65 Wash 2d 777, 787, 399 P2d 591, 597 (1965) ("In the case at bar, the city did not supervise the activities of the workmen, did not furnish the appliance which failed and it did nothing affirmatively to increase the risk. The premises were safe when turned over to the contractor and knowledge concerning the hazard which arose thereafter was as available to the contractor as to the city."); *Hymas v. UAP Distribution, Inc.*, 167 Wash App 136, 162, 272 P3d 889, 901, *rev den*, 175 Wash 2d 1006, 284 P3d 742 (2012) (adhering to *Golding v. United Homes Corp.*, 6 Wash App 707, 495 P2d 1040 (1972), in which the court had "reaffirmed the general rule stated in *Epperly* that the owner of premises owes to the servant of the independent contractor employed to perform work on his premises the duty to avoid endangering him by the owner's own negligence or affirmative act, *but owes no duty to protect him from the negligence of his own master*" (emphasis added)); *Golding*, 6 Wash App at 712, 495 P2d at 1043-44 (where "the defendant did not supervise the activities of the independent contractor or his workmen and did nothing affirmatively to increase the risk of harm inherent within the nature of the work" and "the premises were safe when turned over to the contractor," the defendant owed no duty to the contractor's employee). That common law rule is also reflected in *Restatement* section 409, which provides, "Except as stated in §§ 410-429, the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants." *See, e.g.*, *Hymas*, 167 Wash App at 162, 272 P3d at 901 (recognizing that the principle stated in section 409 is part of Washington law).

In *Hymas*, the court explained the relationship between *Restatement* sections 343 and 343A and the general rule of nonliability for acts of independent contractors, which, as noted, is expressed in both *Restatement* section 409 and the Washington case law on which defendant relies.

In that case, the plaintiff was an employee of an excavation and concrete contractor who was injured when he fell into a trench that his employer had dug for the foundation of a building. The defendant corporation was the landowner and was overseeing the construction of the building. *Id.* at 142-43, 272 P3d at 892. On appeal of a summary judgment for the defendant, the plaintiff argued, among other things, that the defendant owed him a duty on a premises liability theory. *Id.* at 159, 272 P3d at 900.

The plaintiff acknowledged that the Washington Supreme Court had held that "[a] landowner's responsibility for the condition of the land does not make the landowner liable for the negligent acts or omissions of an independent contractor." *Id.* at 161, 272 P3d at 901 (citing *Lamborn v. Phillips Pac. Chem. Co.*, 89 Wash 2d 701, 708, 575 P2d 215, 220 (1978)). However, he argued that the court had abrogated that rule when it adopted *Restatement* sections 343 and 343A to govern the duties of premises owners to licensees. *Id.* at 162, 272 P3d at 901.

The *Hymas* court disagreed. It explained that the Washington case law reflects *Restatement* section 409, and that principle limits the court's analysis of landowners' duties to invitees under sections 343 and 343A:

> "[T]he principles of common law reflected in sections 343 and 343A do not displace common law limitations on a principal's liability to an independent contractor's employees, which are themselves recognized at, *e.g.*, *Restatement* §§ 409, 413 and 414, as well as in the cases relied upon by [the defendant]. Both sets of principles are recognized in Washington cases and each operates in its proper sphere."

*Id.*, 272 P3d at 901. After explaining how sections 343 and 343A leave room for application of the principle of nonliability for acts of independent contractors, the court concluded that, "[w]here the landowner has discharged its obligation to prepare its land and warn or otherwise protect an independent contractor-invitee, it is other principles of common law, reflected in the *Restatement* at sections 409-429, that address the relative responsibilities of the owner and the independent contractor for the independent contractor's

activities." *Id.* at 163, 272 P3d at 902. In *Hymas*, the court concluded that the general rule of nonliability applied and no exceptions applied. Thus, it affirmed the trial court's grant of summary judgment. *Id.* at 164-65, 272 P3d at 903.

*Hymas* establishes that defendant is correct that the general rule of nonliability is applicable here—unless one of the exceptions to that rule applies. However, as explained below, both Washington courts and section 410 of the *Restatement*—which is one of those "other principles of common law, reflected in the *Restatement* at sections 409-429," identified in *Hymas*—recognize an exception for situations in which the plaintiff's theory of liability rests on the negligence of the defendant itself, not just vicarious liability for the negligence of the independent contractor. *Id.* at 163, 272 P3d at 902.

Washington courts have made clear that the general rule of nonliability for acts of independent contractors does not excuse a premises owner from liability for its own negligence. *See, e.g.*, *Tauscher v. Puget Sound Power & Light Co.*, 96 Wash 2d 274, 281, 635 P2d 426, 430 (1981) ("An owner who employs an independent contractor is already liable to all third persons, including employees of the independent contractor, for his or her own negligence[.]"); *Winfrey v. Rocket Research Co.*, 58 Wash App 722, 725, 794 P2d 1300, 1302, *rev den*, 115 Wash 2d 1030 (1990) (rejecting an employer's argument that it owed no duty to the employee of an independent contractor; the employer "fails to acknowledge that completely apart from the question of vicarious liability, is the duty to prevent injuries to invitees on a premises caused by the owner's own negligence"); *see also Hennig v. Crosby Group, Inc.*, 116 Wash 2d 131, 134, 802 P2d 790, 792 (1991) ("Because the [landowner] did not actively supervise [the contractor's] employees, did not furnish the shackle, had no superior knowledge that it might be defective, and otherwise *did nothing to affirmatively increase the risk*, the trial court properly dismissed the [landowner]." (Emphasis added.)).

Consistently with that case law, section 410 of the *Restatement* establishes an exception from the general rule of nonliability where the harm arises from the premises

owner's negligent direction of the contractor. Section 410 provides as follows:

> "The employer of an independent contractor is subject to the same liability for physical harm caused by an act or omission committed by the contractor pursuant to orders or directions negligently given by the employer, as though the act or omission were that of the employer himself."

Section 410 is one of the sections of the *Restatement* that *Hymas* identified as applying in conjunction with sections 343 and 343A to determine the liability of landowners. 167 Wash App at 163, 272 P3d at 902; *see also Restatement* § 410 comment b (noting that the section applies in conjunction with section 343).[11]

Although no Washington court has expressly applied *Restatement* section 410, that section is among those that the court in *Hymas* identified as governing "the relative responsibilities of the owner and the independent contractor for the independent contractor's activities." 167 Wash App at 163, 272 P3d at 902. It is also consistent with Washington courts' statements that a landowner remains liable to the employees of independent contractors for its own negligence. *See Tauscher*, 96 Wash 2d at 281, 635 P2d at 430; *Winfrey*, 58 Wash App at 725, 794 P2d at 1302; *see also Ventoza v. Anderson*, 14 Wash App 882, 895, 545 P2d 1219, 1229, *rev den*, 87 Wash 2d 1007 (1976) (noting that one of the exceptions to the general rule of nonliability

---

[11] Another exception to the general rule of nonliability exists for injury resulting from inherently dangerous activities by the contractor. *Tauscher*, 96 Wash 2d at 280-81, 635 P2d at 429-30 (noting that "support for the exception [for inherently dangerous activities] to the rule on nonliability is expressed in sections 413, 414, 416 and 427 of the *Restatement (Second) of Torts*" (footnotes omitted)). However, the inherently-dangerous-activities exception is limited to injuries to third parties, as opposed to employees of the contractor. *Id.* at 279, 635 P2d at 429 ("[T]he employer's liability does not extend to employees of independent contractors merely because of the presence of inherently dangerous activities.").

The inherently-dangerous-activities exception is different from the exception set out in *Restatement* section 410 because the former exception imposes vicarious liability on the employer for the contractor's negligence, whereas section 410 imposes liability for the employer's *own* negligence. *See Restatement* § 410 (requiring acts of the contractor to be "pursuant to orders or directions *negligently given* by the employer" (emphasis added)); *accord Tauscher*, 96 Wash 2d at 281, 635 P2d at 430 ("An owner who employs an independent contractor is already liable to all third persons, including employees of the independent contractor, for his or her own negligence[.]").

that was specified by a jury instruction "impose[s] liability upon an employer for negligent direction of the independent contractor (*Restatement (Second) of Torts* § 410 (1965))". Accordingly, we conclude that *Restatement* section 410 accurately represents Washington law.[12]

Here, as the trial court recognized, plaintiff's premises liability theory was that defendant was liable for its own negligence, not negligence of AC&S: Plaintiff contended that defendant was negligent in directing AC&S to install asbestos insulation on the boiler. Plaintiff presented evidence that AC&S was engaged to cover a boiler with asbestos insulation; that defendant knew that insulating with that particular asbestos insulation would unavoidably create large amounts of airborne asbestos; and that defendant knew or should have anticipated that Golik would be injured by the airborne asbestos. She contended that Golik's mesothelioma was the direct result of defendant's negligent act of directing AC&S to install large amounts of asbestos insulation.

As noted above, defendant asserts that the airborne asbestos cannot be considered a dangerous condition on their premises because the premises were safe when AC&S started work. As we have explained, however, *Restatement* sections 343 and 343A work together with *Restatement* sections 409 and 410 to establish that a premises owner can

---

[12] It is possible that Washington courts might hold that the principle recognized by section 410, like the inherently-dangerous-work exception, is limited to liability for harm to third parties, as opposed to harm to the employees of the independent contractor. However, we note that the text of section 410 does not limit its application in that way, in contrast to other sections. *See Restatement* § 411 (limiting employer's liability for negligent selection of contractors to harm to "third persons"). Moreover, the principle recognized in section 410 is a close relative of the retained-control theory that Washington courts have embraced. *See Gass v. Virgin Islands Tel. Corp.*, 311 F3d 237, 241 n 3 (3d Cir 2002) ("[O]ur analysis in this section applies to both sections 410 and 414. With respect to the issue presented in this case, there is no need to distinguish between the sections because they differ only in the degree of control exercised by the employer of the independent contractor. Under section 410, the employer must be alleged to have given orders or directions negligently, and under section 414, the employer must be alleged to have exercised his retained control negligently. Both sections deal with the direct liability imposed on the employer of the independent contractor for his own negligent acts. That commonality between the sections is at the core of this Court's analysis of the issue of the availability of employer liability."). In light of those considerations and Washington courts' statements that landowners remain liable for their own negligence, we conclude that the principle of section 410 is not limited to liability for harm to third parties.

be liable for an independent contractor's creation of an obviously dangerous condition on the land when the owner negligently directs the contractor to create the dangerous condition and should anticipate that, despite its obviousness, the contractor's employee will be injured by it. Thus, the trial court correctly determined that the jury could consider plaintiff's theory that AC&S's creation of large amounts of airborne asbestos was a dangerous condition on defendant's premises. The trial court did not err in denying defendant's JNOV motion on the premises liability claim.

Next, we turn to defendant's argument that the trial court erred in denying its JNOV motion on plaintiff's negligence claim. First we consider plaintiff's theory that defendant owed Golik a duty under the common law because it retained control over his work. As discussed above, the general rule is that "an employer who contracts with an independent contractor is not liable for injuries sustained by an independent contractor's employees." *Cano-Garcia v. King County*, 168 Wash App 223, 246, 277 P3d 34, 48, *rev den*, 175 Wash 2d 1010, 287 P3d 594 (2012); *see also Restatement* § 409 (stating the rule). An exception applies when the employer retains control over the contractor's work: "[W]here the employer retains control over some part of the independent contractor's work, the employer has a duty within the scope of that control to provide a safe place to work." *Cano-Garcia*, 168 Wash App at 246, 277 P3d at 48.

The reasoning underlying the exception is that, if an employer retains "the right to direct the manner in which the work is performed," the independent contractor effectively becomes an employee, rendering the general rule inapplicable. *Kamla*, 147 Wash 2d at 121, 52 P3d at 475-76. Consequently, if the retained control is over the work in general, it must be pervasive, and, if it involves only one aspect of the work, it must be extremely detailed. *See Afoa v. Port of Seattle*, 176 Wash 2d 460, 481, 296 P3d 800, 812 (2013) (Although "not every licensor or jobsite owner takes on a common law duty to maintain a safe workplace any time it requires on-site workers to comply with safety rules and regulations," "a jobsite owner who exercises pervasive control over a work site should keep that work site safe for all workers[.]"); *Kinney v. Space Needle Corp.*, 121 Wash App

242, 244-45, 247-48, 85 P3d 918, 919, 921 (2004) (the record contained sufficient evidence of retained control over safety where the employer—not the independent contractor— provided "the safety equipment including safety lanyards, harnesses, hoists, couplings, and safety lines with stops" for the contractor's crew; instructed the crew about required safety procedures; had responsibility to control security and safety issues for the crew; controlled their access to and around the structure; and supervised and monitored the crew). The ultimate question is whether the employer, rather than the independent contractor, is acting, or is entitled to act, like the worker's direct employer.

Defendant contends that plaintiff failed to present evidence sufficient to show, under Washington law, that defendant retained enough control over AC&S's or Golik's work to require it to provide a safe place to work. As explained below, we agree.

Plaintiff did not introduce any contract between defendant and AC&S or between defendant and a general contractor who subcontracted with AC&S for the work that AC&S did at defendant's mill. Rather, to show that defendant retained control over the work of AC&S and Golik, plaintiff relied on general information about defendant's contracting practices from the deposition testimony of defendant's corporate representative, Barry Carson, and on provisions from several documents related to contracts that defendant entered into at other times with other contractors.

Carson testified that, for insulation contracts, defendant would put out requests for proposals that included drawings and specifications, including the brand of insulation to be used. Regarding who was responsible for safety under insulation contracts, Carson agreed that in "third-party contract[s] with other parties, including asbestos insulation subcontractors," although the contractors were responsible for safety, defendant retained the right to "stop the job if [defendant] felt it was unsafe."

None of Carson's testimony indicates that defendant had "the right to exercise day to day control over the manner in which the details of the work are performed." *Epperly*, 65 Wash 2d at 785, 399 P2d at 596. The Washington Supreme

Court has explained that provisions in a contract whose purpose is to allow the employer to "insure that it receives the product which it desires and within the time limit specified for the completion of the work" do not show retained control. *Id.*, 399 P2d at 596. For that reason, specifications for the work, even "detailed specifications," do not show retained control. *Id.* at 779, 399 P2d at 593. The same is true of the right to stop work for safety violations. *Cano-Garcia*, 168 Wash App at 237, 277 P3d at 43 ("Although the contract language provided for inspections to ensure compliance with the contract and relevant laws and regulations and stop work authority if an imminent threat to safety arose, those powers alone are not enough to constitute retained control.").

Plaintiff also proffered, and the court ultimately admitted, parts of other contracts and documents related to some of defendant's contracts with other contractors for other work.[13] The court held that the documents were admissible only for a limited purpose: Accepting plaintiff's representations that the documents showed "a pattern in the language of how the respective defendants managed their contractors and the control that they maintained with respect to their contractors," the court admitted the documents on the theory that, to the extent that provisions in the documents demonstrated a pattern with regard to how much control defendant retained over contractors, "the inference could be drawn that similar language would have been * * * included in the AC&S contract, to the extent there was one." In keeping with that limited purpose, the court gave the jury a limiting instruction regarding the documents.

On appeal, plaintiff identifies four documents and provisions that, it contends, show that, regardless of whether AC&S contracted directly with defendant or was hired by another subcontractor, defendant retained sufficient control over the way AC&S carried out its work that it was responsible for AC&S's employees. The first states, "The Contractor

---

[13] Defendant challenges the admission of those documents in some of its assignments of error based on the general judgment and incorporates those arguments into its assignment to the denial of the JNOV. We need not address the admissibility of the documents because, as explained below, we conclude that, even if they were properly admitted, they do not establish that defendant retained control over the work of AC&S or Golik.

shall comply with the basic safety rules of the particular mill which cover such items as personal safety, speed limits, smoking areas." No safety rules for the Camas mill appear in the record. The second provides detailed specifications for installation of asbestos-containing insulation on equipment at the Camas mill. Third, plaintiff relies on a section of a contract providing that, if the contractor failed to provide "properly skilled workmen" or "disregard[ed] the instructions" of defendant's appointed representative, then defendant could terminate the contract on three days' notice. Finally, plaintiff relies on a provision that required defendant to give written approval before any work could be done by a subcontractor because "the ability and reputation of the party to whom any part of the work may be sub-let is a matter of importance to" defendant.

Those provisions do not demonstrate that defendant retained control over the manner in which AC&S or Golik performed the work. The latter three provisions are ways in which defendant sought to "insure that it receives the product which it desires"; they define the work to be performed and provide contract-based methods of quality control. *Epperly*, 65 Wash 2d at 785, 399 P2d at 596; *see also Hymas*, 167 Wash App at 157, 272 P3d at 899 (noting that the right to reject work or stop the work of an independent contractor is not retained control).

The first provision—providing that "[t]he Contractor shall comply with the basic safety rules of the particular mill which cover such items as personal safety, speed limits, smoking areas"—would contribute some weight to a body of evidence indicating that defendant retained control over the safety of AC&S's work. However, alone, it does not show sufficient retained control to justify imposing liability on an employer of an independent contractor as the direct employer of the contractor's employees. The Washington Supreme Court has explained that "not every licensor or jobsite owner takes on a common law duty to maintain a safe workplace any time it requires on-site workers to comply with safety rules and regulations. *Afoa*, 276 Wash 2d at 481, 296 P3d at 811. Here, none of the other evidence suggests that defendant retained control like an employer, rather than specifying the timing and quality of the work, like a

contracting party. Carson testified that contractors, rather than defendant, were ultimately responsible for safety. And the evidence about AC&S's work practices indicated that that company's workers were supervised by an AC&S foreman, not an employee of defendant. The provision requiring independent contractors to follow mill rules does not, alone, show sufficient retained control.

Thus, the provisions that plaintiff relies on do not show that defendant retained control of the manner in which AC&S and Golik performed the work. Nor has our examination of the record revealed any other pattern of provisions demonstrating retained control. Consequently, the record does not support plaintiff's theory that defendant owed Golik a common-law duty because it retained sufficient control over the manner in which he performed the work to make him akin to an employee, rather than an independent contractor.

However, that does not mean that the court's error was a reversible one. As explained above, on plaintiff's second claim, plaintiff presented two alternative theories of duty to the jury, and the jury accepted both. Consequently, the court did not commit reversible error in denying defendant's JNOV motion on plaintiff's second claim unless both theories of duty were invalid. *Cf. Burley v. Clackamas County*, 298 Or App 462, 464, 446 P3d 564, *rev den*, 365 Or 721 (2019) (where "claims were presented to the jury as independent, alternative theories of liability based upon the same conduct" by the defendant, "if either one went to the jury in an error-free way, then any error that may have occurred in submitting the other theory to the jury would be harmless"). Thus, we briefly consider, and reject, defendant's challenge to plaintiff's statutory-duty theory of duty.

Defendant argues that, to prevail on her statutory-duty theory, plaintiff had to prove that defendant retained the same degree of control over the work of AC&S and Golik as is required to show that defendant owed a common-law duty to Golik as the employee of its independent contractor. We disagree. The statute imposed on an employer a duty to all workers, regardless of whether the worker was a direct employee or the employee of an independent contractor.

*Former* RCW 49.16.030 (1967) (requiring an employer to "furnish a place of work that is as safe for workmen therein as may be reasonable and practicable under the circumstances"); *Bayne v. Todd Shipyards Corp.*, 88 Wash 2d 917, 920, 568 P2d 771, 773 (1977) ("[*Former* RCW 49.16.040 (1971)] requires a safe place of work for workmen. It does not limit it to employees of the defendant employer."). Accordingly, to the extent that plaintiff's statutory claim might require a showing of some control over the injury-causing work, the degree of control that it requires is much less than the high degree of control necessary to show a common-law duty to the employee of an independent contractor.

In summary, the trial court did not err in granting defendant's motion for a new trial or in denying its JNOV motion.

Affirmed on appeal and cross-appeal.